**MOGINRUBIN LLP**
Daniel J. Mogin (SBN 95624)
Timothy Z. LaComb (SBN 314244)
4225 Executive Square, Suite 600
La Jolla, CA 92037
Telephone:     (619) 687-6611
dmogin@moginrubin.com
tlacomb@moginrubin.com

**JOSEPH SAVERI LAW FIRM, LLP**
Joseph R. Saveri (SBN 130064)
Cadio Zirpoli (SBN     179108)
Christopher K. L. Young (SBN 318371)
Kevin E. Rayhill (SBN 267496)
601 California Street, Suite 1000
San Francisco, CA 94108
Tel (415) 500-6800
jsaveri@saverilawfirm.com
czirpoli@saverilawfirm.com
cyoung@saverilawfirm.com
krayhill@saverilawfirm.com
*Attorneys for Plaintiffs*

*Additional counsel on signature page*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| HANSON DAI, MAX CHISWICK, ADOLPH ROBLES, STEVEN STACK, MATTHEW GILBERT, MICHAEL MOLINARO, TONY QIAN, and MARK LESTER,<br><br>    Plaintiffs,<br><br>    vs.<br><br>SAS INSTITUTE, INC., IDEAS, INC., CHOICE HOTELS INTERNATIONAL, INC, WYNDHAM HOTELS & RESORTS, INC., HILTON WORLDWIDE HOLDINGS, INC., FOUR SEASONS HOTELS AND RESORTS US, INC., OMNI HOTELS & RESORTS, INC., HYATT HOTEL CORPORATION,<br><br>    Defendants. | Case No:<br><br>**COMPLAINT FOR:**<br><br>(1) Violation of Sherman Act, § 1<br><br><br><u>**CLASS ACTION**</u><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs HANSON DAI, MAX CHISWICK, ADOLPH ROBLES, STEVEN STACK, MATTHEW GILBERT, MICHAEL MOLINARO, TONY QIAN, and MARK LESTER, bring this action against Defendants SAS INSTITUTE INC. and IDEAS INC., (collectively, "RMS Defendants") and CHOICE HOTELS INTERNATIONAL INC., WYNDHAM HOTELS & RESORTS, INC., HILTON WORLDWIDE HOLDINGS, INC., FOUR SEASONS HOTELS AND RESORTS US INC., OMNI HOTELS & RESORTS, and HYATT HOTEL CORPORATION,  (collectively, "Operator Defendants"; collectively with RMS Defendants, "Defendants"), for damages and injunctive relief for themselves and on behalf of the class of all persons similarly situated for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and allege as follows:

## I.   NATURE OF THE ACTION

1.     Operator Defendants are horizontal competitors and several of the largest hotel operators in the U.S. Rather than compete on price, Operator Defendants agreed, conspired, and/or combined to fix, raise, and stabilize hotel room rental prices nationally and in the Relevant Sub-markets in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).[1]  The Operator Defendants fixed prices through a shared pricing algorithm developed by the RMS Defendants and through other means of communication, interactions, and signals to and with their co-conspirators.

---

[1]  The Relevant Sub-markets are the markets for hotel room rentals in the following locations: the Atlanta–Sandy Springs–Roswell, GA MSA; the Baltimore-Columbia-Towson, MD MSA; the Boston-Cambridge-Newton, MA-NH MSA; the Chicago-Naperville-Elgin, IL-IN-WI MSA; the Dallas-Fort Worth-Arlington, TX MSA; the Houston-Pasadena-The Woodlands, TX MSA; the Las Vegas-Henderson-North Las Vegas, NV MSA; the Los Angeles-Long Beach-Anaheim, CA MSA; the Miami-Fort Lauderdale-West Palm Beach, FL MSA; the New Orleans-Metairie, LA MSA; the New York-Newark-Jersey City, NY-NJ MSA; the Orlando-Kissimmee-Sanford, FL MSA; the San Francisco–Oakland–Fremont, CA MSA; the Seattle-Tacoma-Bellevue, WA MSA; and the Washington-Arlington-Alexandria, DC-VA-MD-WV MSA.

2.      To effectuate the conspiracy, each Operator Defendant agreed to provide IDeaS with a continuous stream of non-public, competitively sensitive price and occupancy information in real time or near real time, knowing that their horizontal competitors are also sharing their competitively sensitive price and occupancy information in real time or near real time, giving IDeaS a clear and unparalleled view of competitive conditions in the Relevant Sub-markets. This includes non-public information such as the price paid by consumers for each room, the quantity of rooms available by room type, whether any consumers attempted to book a room that was no longer available, and room rates not available to the public. IDeaS plugs this confidential information into its algorithm and generates supra-competitive pricing recommendations for each Operator Defendant, which the Operator Defendants then implement in nearly every instance. The Operator Defendants know their horizontal competitors are also implementing IDeaS's supra-competitive pricing because IDeaS tells them so, and because every businessperson knows that the only way a company can consistently raise prices above the competitive rate is if its horizontal competitors also agree to raise their prices above the competitive level.

3.      By sending their sensitive confidential pricing and occupancy information to a third party to process, analyze, and develop supra-competitive prices, the Operator Defendants are able to achieve the same result as if they secretly met in a back room and exchanged their information and agreed to a supra-competitive price. This is an old-fashioned horizontal conspiracy between competitors, and it is *per se* illegal.

4.      Advances in computing technology have enabled companies such as the RMS Defendants to develop algorithms whose power and reach far surpass what was possible even a decade ago. Scholars and enforcement officials have been predicting for years that the day would soon arrive when competitors could effectuate a horizontal conspiracy by outsourcing their pricing decisions to a third-party algorithm with access to the competitors' data. As IDeaS

COMPLAINT

trumpets on their website, that day has arrived. "Transform data into revenue" it proclaims.[2] Testimonials tell the story: "IDeaS has an insane ability to quickly respond to changes in a dynamic market. There's no one human that can physically do what this product can do— there's so much that goes into the algorithm. Revenue managers should simply believe in the tool, have faith in it, and they will achieve results that exceed their expectations."[3]

5.      In addition, IDeaS conducts user-only events, summits, and meetings with the co-conspirator hotel operators, which it represents are "…to showcase how IDeaS consolidates hotel data to deliver total profit optimization."[4]   IDeaS bestows awards to its clients at these meetings for the stated purpose of "honoring individuals for their collaboration, partnership, bold thinking and mutual support of progress and innovation."[5]

6.      Operator Defendants engage in these actions knowing (i) which of their competitors are participating in the conspiracy; (ii) that IDeaS is collecting similar confidential data from each participating competitor to make its pricing recommendations; (iii) that these competitors are adopting IDeaS' pricing recommendations; and (iv) the more faithfully each competitor adopts IDeaS' pricing recommendations, the more revenue and profit each competitor will earn. Not only does IDeaS prominently highlight these facts in marketing materials, but it also proves these points when sharing competitively sensitive competitor data directly with users.

7.      Defendants' conspiracy has succeeded. By agreeing to provide IDeaS with non-public data and implementing the resulting price recommendations, Operator Defendants have been able to increase hotel room rates significantly above the competitive level in the Relevant

---

[2] https://ideas.com/.
[3]   https://ideas.com/about/partners.
[4]https://www.hospitalitynet.org/news/4111666.html#:~:text=insights%20and%20best,total%20profit%20optimization.
[5] https://ideas.com/client-award-recipients.

COMPLAINT

Sub-markets. Based on publicly available data, every Operator Defendant is currently charging the highest or near-highest average rates for hotel rooms in its history despite a lack of corresponding increase in occupancy demand.

8.      Defendants' conspiracy has harmed competition and consumers. By agreeing to use a shared algorithm to set prices, Operator Defendants have replaced independent decision-making by marketplace competitors with cooperative price-fixing, thereby eliminating or severely impairing market competition. And, by artificially inflating hotel room rates to supra-competitive levels through their conspiracy, Operator Defendants have overcharged Plaintiffs and Class Members, thereby inflicting upon them economic harm and antitrust injury.

9.      In sum, by agreeing to use the pricing recommendations generated by the shared algorithm, Operator Defendants have agreed and conspired to outsource their independent pricing decision-making to a single, common pricing manager—IDeaS, which has willingly facilitated and enforced the conspiracy. Consumers have been harmed as a result, paying higher prices for hotel rooms and losing important sources of competition. Defendants' conspiracy is a price-fixing combination in violation of Section 1 of the Sherman Act.

## II.    PARTIES

10.     Plaintiff HANSON DAI is a citizen and resident of Illinois. Mr. Dai has rented hotel rooms at Defendants' properties in the Relevant Sub-markets of Seattle, Chicago, New Orleans, and Las Vegas during the Class Period. Mr. Dai paid higher prices for these room rentals because of the antitrust violations alleged herein.

11.     Plaintiff MAX CHISWICK is a citizen and resident of Illinois. Mr. Chiswick has rented hotel rooms at Defendants' properties in the Relevant Sub-markets of Los Angeles, Miami, San Francisco, and New York during the Class Period. Mr. Chiswick paid higher prices for these room rentals because of the antitrust violations alleged herein.

12.     Plaintiff ADOLPH ROBLES is a citizen and resident of Texas. Mr. Robles has rented hotel rooms at Defendants' properties in the Relevant Sub-market of Houston during the Class Period. Mr. Robles paid higher prices for these room rentals because of the antitrust violations alleged herein.

13.     Plaintiff STEVEN STACK is a citizen and resident of South Carolina. Mr. Stack has rented hotel rooms at Defendants' properties in the Relevant Sub-markets of New Orleans and New York during the Class Period. Mr. Stack paid higher prices for these room rentals because of the antitrust violations alleged herein.

14.     Plaintiff MATTHEW GILBERT is a citizen and resident of South Carolina. Mr. Gilbert has rented hotel rooms at Defendants' properties in the Relevant Sub-markets of Los Angeles, and Orlando during the Class Period. Mr. Gilbert paid higher prices for these room rentals because of the antitrust violations alleged herein.

15.     Plaintiff MICHAEL MOLINARO is a citizen and resident of Illinois. Mr. Molinaro has rented a hotel room at Defendants' properties in the Relevant Sub-market of Chicago during the Class Period. Mr. Molinaro paid higher prices for these room rentals because of the antitrust violations alleged herein.

16.     Plaintiff TONY QIAN is a citizen and resident of New Jersey. Mr. Qian has rented hotel rooms at Defendants' properties in the Relevant Sub-markets of Washington D.C., Las Vegas, Miami, Los Angeles, San Francisco, Dallas, Seattle, and New York during the Class Period. Mr. Qian paid higher prices for these room rentals because of the antitrust violations alleged herein.

17.     Plaintiff MARK LESTER is a citizen and resident of Florida. Mr. has rented hotel rooms at Defendants' properties in the Relevant Sub-markets of Chicago, Los Angeles, Boston, Miami, Atlanta, Baltimore, and Orlando during the Class Period. Mr. Lester paid higher prices for these room rentals because of the antitrust violations alleged herein.

18.     Defendant SAS INSTITUTE INC. develops analytics software and is headquartered and incorporated in North Carolina. It is the parent company of IDeaS, acquiring it in 2008. It is the developer of the analytics used by IDeaS' revenue management system ("RMS").

19.     Defendant IDEAS INC. is headquartered in Bloomington, Minnesota and incorporated in Delaware. IDeaS is a subsidiary of Defendant SAS. IDeaS is the dominant provider of revenue management and profit optimization software and services for hotel operators. Its software has been implemented at more than 30,000 properties worldwide, including by Operator Defendants in each of the Relevant Sub-markets.

20.     Defendant HILTON WORLDWIDE HOLDINGS INC. ("Hilton") is a multinational hospitality company headquartered in McLean, Virginia and incorporated in Delaware. It operates hundreds of properties in the United States, including in each of the Relevant Sub-markets. Throughout the Class Period, it provided IDeaS with non-public, competitively sensitive, real-time pricing and occupancy data and received the same information from IDeaS regarding competitors, directly and/or as an input in pricing recommendations from IDeaS.

21.     Defendant CHOICE HOTELS INTERNATIONAL INC. ("Choice") is a hospitality company headquartered in North Bethesda, Maryland and incorporated in Delaware. It has thousands of properties in the US and several in each of the Relevant Sub-markets. Throughout the Class Period, Defendant Choice provided IDeaS with non-public, competitively sensitive, real-time pricing and occupancy data and received the same information from IDeaS regarding competitors, directly and/or as an input in pricing recommendations from IDeaS.

22.     Defendant WYNDHAM HOTELS & RESORTS, INC. ("Wyndham") is an American hotel company headquartered in Parsippany, New Jersey and incorporated in Delaware. It operates hundreds of properties in the US, including in each Relevant Sub-market.

Throughout the Class Period, Defendant Wyndham provided IDeaS with non-public, competitively sensitive, real-time pricing and occupancy data and received the same information from IDeaS regarding competitors, directly and/or as an input in pricing recommendations from IDeaS.

23.    Defendant FOUR SEASONS HOTELS AND RESORTS US INC. ("Four Seasons") is the US-based subsidiary of Four Seasons Hotels and Resorts. It is headquartered and incorporated in Delaware. There are more than 40 Four Seasons hotels in the US, including at least one in each of the Relevant Sub-markets. Throughout the Class Period, Defendant Four Seasons provided IDeaS with non-public, competitively sensitive, real-time pricing and occupancy data and received the same information from IDeaS regarding competitors, directly and/or as an input in pricing recommendations from IDeaS.

24.    Defendant OMNI HOTELS & RESORTS INC. ("Omni") is a hospitality company that is headquartered in Dallas, Texas. It is wholly owned by TRT Holdings, Inc. There are approximately 50 Omni hotels in the United States. Throughout the Class Period, Defendant Omni provided IDeaS with non-public, competitively sensitive, real-time pricing and occupancy data and received the same information from IDeaS regarding competitors, directly and/or as an input in pricing recommendations from IDeaS.

25.    Defendant HYATT HOTEL CORPORATION ("Hyatt") is a multinational hospitality company headquartered in Chicago, Illinois and incorporated in Delaware. There are 791 Hyatt hotels in the United States as of November 20, 2023, including multiple in each of the Relevant Sub-markets. Throughout the Class Period, Defendant Hyatt provided IDeaS with non-public, competitively sensitive, real-time pricing and occupancy data and received the same information from IDeaS regarding competitors, directly and/or as an input in pricing recommendations from IDeaS.

26.     The acts alleged to have been done by Defendants were authorized, ordered, or performed by their directors, officers, managers, agents, employees, or representatives in the course of their employment and while actively engaged in the management of Defendants' affairs.

27.     Each Defendant, with respect to and through its subsidiaries, divisions, affiliates and agents, committed the acts alleged herein in concert, with each acting as the agent or joint-venturer of or for the others with respect to the acts, violations, and common course of conduct alleged herein, and under the authority and apparent authority of parent entities, principals and controlling parties.

28.     Various hotel operators not named as defendants in this Complaint participated as co-conspirators in the alleged conspiracy herein through their use of IDeaS' RMS and pricing algorithm and performed acts and made statements in furtherance thereof. These co-conspirators include Accor S.A. ("Accor"), a multinational hospitality company with more than 40 hotels in the U.S. Defendants are jointly and severally liable for the acts of their co-conspirators whether or not named as defendants in this Complaint.

## III.    JURISDICTION AND VENUE

29.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, as this action arises out of Section 1 of the Sherman Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26).

30.     This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act (15 U.S.C. § 22), Federal Rule of Civil Procedure 4(h)(1)(A), and California's long-arm statute.

31.     Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, may be found in and transact business in the forum state, including the rental of hotel guest rooms.

32.     Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, engage in interstate commerce in the sale of hotel guest rooms.

33.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and the federal venue statute (28 U.S.C. § 1391), because one or more Defendants maintain business facilities, have agents, transact business, and are otherwise found within this District and certain unlawful acts alleged herein were performed and had effects within this District.

## IV.   CLASS ACTION ALLEGATIONS

34.     Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), seeking damages as well as equitable and injunctive relief for the following class:

> All persons and entities in the United States and its territories who rented Operator Defendants' hotel guest rooms in the Relevant Sub-markets during the period of April 26, 2020, until the Defendants' unlawful conduct and its anticompetitive effects cease to persist (the "Rental Class").

35.     Plaintiffs also bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2), seeking equitable and injunctive relief for the following class:

> All persons and entities in the United States and its territories who rented Operator Defendants' or co-conspirators' hotel guest rooms in the United States during the period of April 26, 2020, until the Defendants' unlawful conduct and its anticompetitive effects cease to persist (the "National Class").

36.     Specifically excluded from the Classes are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from the Classes are any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action.

37.     Class Identity: The Classes are readily identifiable and for which records exist.

38.     Numerosity: Class Members are so numerous and geographically dispersed that joinder is impracticable. There are at least tens of thousands of members in the proposed Classes.

39.     Typicality: Plaintiffs' claims are typical of the claims of Class Members because Plaintiffs overpaid for hotel room rentals from Operator Defendants because of the conspiracy alleged herein.

40.     Defendants have acted in a manner that applies generally to Plaintiffs and all Class Members. Each Class Member has been similarly impacted by Defendants' unlawful conduct and concerted action alleged herein.

41.     Commonality:  There are questions of law and fact common to the Classes, including, but not limited to:

     a.     Whether Defendants have entered into a contract, combination, conspiracy, or common understanding to increase hotel room rental prices and/or suppress the supply of hotel rooms in the Relevant Sub-markets;

     b.     Whether Defendants' conduct artificially increased prices for hotel room rentals in the Relevant Sub-markets;

     c.     Whether Defendants' conduct violates Section 1 of the Sherman Act;

     d.     Whether Plaintiffs and Class Members were injured by Defendants' conduct;

     e.     Whether Defendants conduct should be analyzed as a per se violation or under a quick look or rule of reason analysis;

42.     Predominance: The above-listed questions of law and fact are common to all Class Members and predominate over any questions that may affect Class Members individually.

43.     Adequacy:  Plaintiffs will fairly and adequately protect the interests of the Classes in that Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Classes and Plaintiffs have retained counsel competent and experienced in the prosecution of complex antitrust class actions to represent themselves and the Classes.

44.     Superiority and Manageability: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all Class Members is impracticable. The individual prosecution of separate actions by individuals would lead to repetitive adjudication of common questions of fact and law and create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants.  There will be no difficulty in the management of this action as a class action.

## V.     FACTUAL BACKGROUND

### A.     Competitive Hotel Room Rental Markets

45.     In a competitive hotel room rental market, each hotel operator prices rooms independently based on its own analysis and data. Room rates are typically based on a variety of factors, including location, seasonality, and demand. Given the relative fungibility of hotel rooms, particularly when grouped by class, hotels generally compete on price, by reducing room rates or offering other valuable concessions to guests.

46.     This competition disciplines prices and leads to lower prices and higher quality for consumers. In a functional, competitive market, if a hotel operator prices rooms above the competitive level, then its competitors' prices will be lower and consumers will elect to stay at the competing properties. Therefore, absent collusion, a hotel operator would lose business if its room prices exceed the competitive level and eventually go out of business.

47.     However, Defendants have subverted these competitive market dynamics by colluding on prices, leading to supra-competitive room rates. The Operator Defendants can

price in this manner because they know their co-conspirator hotel operators will not compete on prices.

**B.      IDeaS' Pricing Recommendations Subvert the Competitive Market.**

48.      IDeaS is the world's leading provider of RMS for hotel operators. Its flagship RMS, G3 RMS, is the hotel industry's leading revenue management system, analyzing over 100 million pricing and booking decisions for over 1.6 million hotel rooms daily.

49.      According to IDeaS, G3 RMS "delivers scientific pricing and inventory control decisions at the room type and rate code level to drive optimal revenue performance across segments. Powered by SAS High Performance Analytics, G3 RMS automates pricing, restrictions, and overbooking decisions to maximize RevPAR [revenue per available room] and helps you focus on what's important."[6]  Thus, users of G3 RMS outsource pricing decisions to IDeaS. IDeaS' other RMS solutions provide these same services to users.

50.      IDeaS also offers individualized RMS solutions. For example, IDeaS partnered with Operator Defendant Choice to develop ChoiceMax, a mobile-first RMS used by Choice hotel managers and powered by IDeaS' data and algorithm.[7]

51.      In addition to pricing recommendations, IDeaS' RMS provides users with other data points, such as competitors' real-time pricing and pricing changes, occupancy rates and forecasts, and unit characteristics that hotel operators can use when setting prices. Like the pricing recommendations, this information incorporates competitively sensitive, non-public information collected from all its hotel operator participants.

52.      IDeaS' RMS uses an algorithm to calculate pricing recommendations. The algorithm is constantly improving its ability to price supra-competitively and increase revenue

---

[6] https://ideaservices.wpenginepowered.com/wp-content/uploads/2020/06/IDeaS-G3-RMS-Brochure-EE.pdf.
[7] https://media.choicehotels.com/2022-04-18-Choice-Hotels-International-Announces-Collaboration-with-IDeaS-to-Empower-Franchisee-Revenue-Growth

for users by continually learning and correcting itself using the data provided by participants (which includes non-public, competitively sensitive, real-time data on pricing and occupancy).

53.     According to an IDeaS business partner, "IDeaS has an insane ability to quickly respond to changes in a dynamic market. There's no one human that can physically do what this product can do—there's so much that goes into the algorithm. Revenue managers should simply believe in the tool, have faith in it, and they will achieve results that exceed their expectations."[8]

54.     As both the FTC and DOJ have recognized, algorithms can be used to fix prices more easily and effectively than traditional methods because of their capacity to process huge quantities of information far more quickly than a human analyst. They can also minimize the incentive for cartel members to cheat, i.e., deviate from the fixed price, because the algorithms not only enhance the ability to optimize cartel gains but also can monitor real-time deviations from cartel pricing to quickly identify non-conforming cartel members.[9]

55.     IDeaS' RMS and pricing algorithm is significantly more comprehensive and harmful to competition than other sources of data. For example, most large hotel operators pay a relatively nominal fee for so-called STR Reports. These reports are sent to users on a weekly or monthly basis. They are benchmarking tools that compare a hotel's performance to a competitive set of hotels based on historical data. The STR data, which is anonymized and aggregated, includes several metrics such as RevPAR and ADR. However, such reports do not create the same legal issues as IDeaS' RMS because they do not provide pricing recommendations or unencrypted, non-aggregated competitor data. While hotels can use STR

---

[8] https://ideas.com/about/partners/#:~:text=%E2%80%9CIDeaS%20has%20an%20insane%20ability%20to%20quickly%20respond,they%20will%20achieve%20results%20that%20exceed%20their%20expectations.%E2%80%9D

[9] *See, e.g.*, Salil K. Mehra, *Price Discrimination-Driven Algorithmic Collusion: Platforms for Durable Cartels*, 26 Stan. J. L. & Bus. Fin. 171, 177 (2021).

Reports as an input when setting prices, they do not remove any component of pricing decision-making from hotels.

56.     Some hotels also use platforms like Demand360, which provides demand forecasts based on anonymized, aggregated competitor data. Demand360 does not provide pricing recommendations or unencrypted, non-aggregated competitor data. Participating hotels can use Demand360's demand forecasts as an input for pricing strategies, but it does not replace or delegate pricing decisions by hotels as does IDeaS' RMS.

### 1.     IDeaS' RMS is Designed for Hotel Operators to Outsource Pricing Decisions to IDeaS.

57.     A core feature of IDeaS' RMS is that it automates pricing decisions for Operator Defendants, providing them with supra-competitive pricing and eliminating the need for direct communication between horizontal competitors, i.e., it allows hotel operators, which are horizontal competitors, to delegate pricing decisions en masse to IDeaS and its algorithm. According to IDeaS, this outsourcing of pricing decisions can occur automatically or through minimal human intervention (e.g., using an "upload all" button), depending on the management software used by the hotel operator. But the Operator Defendants are not passive recipients of the RMS Defendants' pricing: the decision to share competitively sensitive business data and accept supra-competitive pricing, with the knowledge that one's competitors are doing the same, always resides with the Operator Defendants. The RMS Defendants and the Operator Defendants may have different roles, but they are equal and active partners in the horizontal conspiracy to raise prices. The conspiracy could not function without the active participation of both sets of defendants.

58.     IDeaS' RMS also updates and optimizes price recommendations on a continuous basis. As soon as the software detects a change in market conditions (which is often triggered by its analysis of non-public data shared by users), the RMS immediately and automatically

updates its recommendations to reflect the change. These pricing updates can occur several times per day and are almost always adopted automatically by hotel operators.

59.     IDeaS prominently and expressly markets the capacity of its RMS to handle pricing decisions for hotel operators. For example, in its 'Buyers Guide to Hospitality Revenue Management Solutions,' IDeaS explains: "Revenue management solutions can help [hotel operators] by providing dependable—and automated—pricing decisions . . . ."[10]

60.     IDeaS makes the price-fixing capabilities of its RMS explicit, describing the algorithm as "technology that produces insights without prompting and makes necessary price changes without you watching over it . . . ."

61.     In its brochure marketing G3 RMS, IDeaS makes the following claims:

- Welcome to the world's most advanced revenue management system, powered by revenue science, advanced analytics and machine learning. Get ready to embrace the full benefits of automation, with accuracy you can count on and decisions you can take to the bank.

- Powered by SAS High Performance Analytics, G3 RMS automates pricing, [room] restrictions and overbooking decisions to maximize RevPAR and help you focus on what's important.

- IDeaS G3 RMS transforms the right data into clear and actionable insights so you can: Fully automate distribution and revenue management tasks allowing you to focus on expectations, critical dates, and more.

- Automation: Continually learns and adapts to how pricing and controls impact booking patterns and demand to improve outputs. Decisions are seamlessly distributed to key technology systems.[11]

62.     IDeaS made similar statements in other marketing materials. In an article discussing the "Science Behind G3 RMS," IDeaS explained that "[f]ull automation eliminates the possibility for user error, creates a framework where our RMS can react as conditions

---

[10] https://ideas.com/tools-resources/hospitality-revenue-management-buyers-guide/
[11]     https://ideaservices.wpenginepowered.com/wp-content/uploads/2020/06/IDeaS-G3-RMS-Brochure-EE.pdf.

change, and limits the need for human resource consumption."[12]  It further explained that its RMS was able to "improve upon itself . . . without human intervention" and that its "groundbreaking artificial intelligence" allowed it to "autocorrect, individually, as needed and continuously learn about the property" without human intervention so that users had "more time back in their day."

63.    Industry observers see that outsourcing pricing to IDeaS is central to its RMS. Hotel Tech Report explained "[a]utomation is at the core of the IDeaS approach to revenue management. . . . The best part of [its pricing model] is that it all happens in real time and in the background, so revenue managers can focus on tactics and strategy rather than manual data entry."[13]

### 2.    IDeaS Generates Pricing Recommendations Based on Non-Public, Competitively Sensitive Data from Competitors.

64.    IDeaS' RMS provides users with recommended prices for every type of hotel room on no less than a daily basis. To generate these recommendations, IDeaS collects hotel operators' non-public, competitively sensitive, real-time data on prices and occupancy. The data collected by IDeaS is very granular and typically includes each participant's transaction-level data for every booking or attempted booking (e.g., a request to book a sold-out room). IDeaS cannot obtain comparable real-time data from any other source.

65.    While some general hotel pricing information is public, much of the information sent to IDeaS by users is non-public. IDeaS uses this non-public information to gain clearer insights into its users' businesses and the hotel room rental market as a whole, enabling IDeaS to make pricing recommendations that increase users' revenue by 8-15%.

66.    The Operator Defendants provide at least the following non-public data to IDeaS:

---

[12]  https://ideas.com/science-behind-g3-rms/
[13]  https://hoteltechreport.com/news/6-powerful-ideas-g3-rms-features%20

- Historical and real-time non-public pricing, which represents a large percentage of sales including those for discounted bookings, group bookings, membership bookings, and extended stay bookings;

- Historical and real-time occupancy levels by property and room-type;

- Historical and real-time occupancy levels by customer-type, including group, retail, discount, wholesale, etc.;

- Interactions with consumers that do not result in transactions (e.g., requests made for sold-out rooms);

- Real-time changes to prices across different platforms;

- Real-time and forecasted revenue by property and room type;

- Other revenue by property and consumer for things like spa, dining, and golf; competitor sets identified by hotels; and dates of special events.

67.     IDeaS uses the non-public data it receives from its users to generate its supra-competitive price recommendations. IDeaS widely publicizes this fact. For example, Stephen Hambleton, Director, Product Management and Solution Success for IDeaS, stated:

> IDeaS' proven approach folds all key data sources directly into optimization *(competitor pricing, for example is accounted for in optimization, as opposed to applying it simply as pricing rules after the RMS sets a price)*, optimizes all room types optimally, and avoids rules in doing so. IDeaS favors an accurate dynamic programming-based optimization, as opposed to simpler deterministic approaches that assume the demand forecast and other calibrations and assumptions are perfect.[14]

68.     Likewise, IDeaS includes the following statements in its brochure for G3 RMS:

> G3 RMS leverages superior analytics to determine the optimal price for all key products by room type, (e.g., Best Flexible Rate and Advance Purchase). This approach considers the demand profile of the product, *competitors' influence* and their impact on other products.

> MARKET DEMAND: *Automatically weights the true influence of competitors' pricing, future demand* and data such as TravelClick Demand360 and more on hotels' pricing to produce the most accurate forecast.[15]

---

[14] https://ideas.com/science-behind-g3-rms.
[15] https://ideasservices.wpenginepowered.com/wp-content/uploads/2020/06/IDeaS-G3-RMS-Brochure-EE.pdf

COMPLAINT

69.     Similarly, when explaining how its RMS can be implemented for new hotels with no historical data, IDeaS explained it uses its "Limited Data Build" feature to generate price recommendations by "clon[ing] data from existing hotels with similar business mixes to provide baselines for demand and predicted guest behavior."[16]

70.     Third parties know that IDeaS uses non-public competitor data to produce its price recommendations. According to Hotel Tech Report:

> Through artificial intelligence and machine learning, [IDeaS' RMS] makes precise revenue management decisions that most revenue managers would never be able to see. Ideal Pricing uses deep market intelligence, such as search penetration, competitor rates, booking trends, and reputation scores, to intelligently forecast demand and power a continuous pricing model.[17]

71.     Hotel Tech Report also provides the following diagram that identifies the inputs used by IDeaS' RMS to generate pricing recommendations, including competitor data:



### 3.     IDeaS Shares Competitor Data with Users, both Directly and through Pricing Recommendations.

72.     IDeaS shares the commercially sensitive, real-time data on prices and occupancy rates provided by hotel operators with its other Hotel Operator IDeaS users. This often includes

---

[16] https://hoteltechreport.com/news/6-powerful-ideas-g3-rms-features%20
[17] https://hoteltechreport.com/news/6-powerful-ideas-g3-rms-features%20

direct competitors' competitively sensitive information, including real-time price changes by competitors wherein the specific competitor is identified.

73.    For example, the following diagram shows an IDeaS G3 RMS dashboard in which IDeaS is providing one user with information about a direct competitor's price changes. The user selected the "Notifications" tab and then the "Competitor Price Change" notification. The right side of the diagram shows that, when making these selections, IDeaS provides the user with transaction-level data about a competitor's price change, including the specific competitor that changed its prices (Clayton Property), the exact change in price ($70 change from $429 to $499), the room type for the price change (Standard Room), and the date of the consumers' stay (4/23/2020). By providing real-time or near-real-time visibility into horizontal competitors' pricing, IDeaS' RMS enables the Operator Defendants to ensure that their own pricing keeps pace with their co-conspirators' supra-competitive pricing and enforces discipline on any co-conspirators who attempt to gain market share by underpricing the other Operator Defendants.



74.    Likewise, a user of Defendant Choice's app, which is powered by IDeaS, explained the app "[m]akes price management so much easier. Get alerts about my competitors' changes and it fits in my schedule."

75.    In addition to distributing non-public, competitively sensitive data to its users, IDeaS also indirectly shares such data with users through their pricing recommendations. As highlighted above, IDeaS analyzes competitor data to make these recommendations and adjusts them in real time based on the competitors' real-time data. For example, if real-time user data indicates a spike in demand for the "double deluxe" room type in the Miami market, then IDeaS will automatically increase the recommended price for that room type.

**C.    Operator Defendants Have Agreed to Fix Hotel Room Rates by Outsourcing Pricing Decisions to IDeaS, which Shares Competitively Sensitive Information with Competitors.**

76.    Through their common use of IDeaS' RMS and its algorithm, Operator Defendants agreed and conspired to share non-public price and occupancy information and to delegate pricing decisions to a common agent—IDeaS. This, in effect, deprives the Relevant Sub-markets of independent centers of decision-making by competitors and allows Operator Defendants to profit from collusive overcharging for hotel rooms in the Relevant Sub-markets.

77.    To receive the benefit of IDeaS' supra-competitive pricing, Operator Defendants must provide their commercially sensitive, real-time, non-public data on prices and occupancy. And they must pay IDeaS a fee. In exchange, IDeaS promises the Operator Defendants revenue increases that beat the market by as much as 36%.[18]  All Defendants knowingly participate in this unlawful conspiracy and profit from it. The losers are Plaintiffs and the Class Members who pay inflated prices for hotel rooms affected by the conspiracy.

---

[18] https://ideas.com/success-story/the-burrard/.

78. Operator Defendants have thereby agreed to use IDeaS' platform to collude and to collectively delegate their pricing decisions to IDeaS. Operator Defendants have agreed to submit their non-public transaction-level data to IDeaS knowing that IDeaS would analyze it together with their competitors' data to generate pricing recommendations for them and their competitors. Operator Defendants also know they would receive, and do receive, competitors' transaction-level data directly from IDeaS. Therefore, IDeaS connects Operator Defendants in a unity of purpose and common design and understanding to fix hotel room prices.

79. Operator Defendants adopt IDeaS' pricing recommendations in nearly every instance and do so knowing their competitors are doing the same. For example, Douglas Lisi, Vice President of Revenue Management, Choice Hotels, stated: "Franchisees are at the core of everything Choice Hotels does, and we are committed to helping them along the road to economic recovery and beyond. This is why we've launched our new revenue management system, ChoiceMAX powered by IDeaS, to help our hoteliers optimize their pricing structure and ultimately increase revenue production. To date, 93 percent of pricing recommendations from ChoiceMAX have been accepted by properties, and the reception of ChoiceMAX among franchisees has been overwhelmingly positive."[19]

80. Operator Defendants know which of their competitors are participating in the conspiracy. As alleged above, Operator Defendants received specific, non-public information about certain competitors, demonstrating those competitors' willing participation in the scheme. IDeaS also openly publicizes the identity of the hotel operators using its RMS, including by issuing press releases when executing agreements with hotel operators,[20] providing numerous

---

[19] https://hoteltechreport.com/news/choice-hotels-international-ideas
[20] https://ideas.com/news/hyatt-will-deploy-ideas-platform/

COMPLAINT

testimonials on its website from hotel operator-users,[21] and listing users in marketing materials, such as the following graphic found in the G3 RMS brochure:

## Leading Hotels Trust IDeaS

   

    

81.    Due to Operator Defendants' adherence to the conspiracy and use of supra-competitive price recommendations, their room rates have increased to record levels, but their occupancy rates are artificially low, remaining at or below pre-Covid levels. And Operator Defendants know that participating in the conspiracy and implementing IDeaS' pricing recommendations lowers occupancy rates. As the following diagram demonstrates, IDeaS provides users with forecasted occupancy rates based on its recommended prices:



---

[21] https://ideas.com/client-success/

82.     IDeaS pressures its users not to deviate from its price recommendations. IDeaS repeatedly stresses that its automated recommendations outperform human intervention. For example, IDeaS makes the following claims in an article by IDeaS explaining how G3 works:

> The groundbreaking artificial intelligence in G3 RMS allows each implementation to autocorrect, individually, as needed and continuously learn about the property at which it's installed (and how its controls are impacting in the market it is supporting), applying and adjusting models to produce the best results. *Humans needn't be involved* in deciding which models and parameters are selected or how data is incorporated. *These are areas a well-designed solution will always perform best*, and it's these automated processes, combined with performance simulations and academic research (not forgetting peer review), that give our users *more confidence in the system's decisions* and more time back in their day—and drive more profit for their hotels.

\*       \*       \*

**Gotta Have Faith**

Science can be fascinating and awe inspiring, but day-to-day progress can be hard to recognize (that said, I am always very passionate about it and always welcome your questions!). The scientific process takes time. It requires rigor and due process, and it can sometimes take time to bring algorithms that inspire confidence to bear, especially when they are applied to thousands of properties' business decisions. And at IdeaS, we wouldn't have it any other way. This type of process is critical in this space, and we do not take our clients' trust for granted.

We are responsible for the performance of our solutions and, ultimately, the success of our clients. That's why we don't cut corners, and *we certainly don't leave anything to chance or human intuition—no offense, humans*. Because of these guiding principles, an IDeaS RMS is future-proof, fully automated, and truly science-backed. And even if all of that still isn't convincing enough for you, the real proof is in the ROI.[22]

83.     IDeaS further pressures users to adopt its pricing recommendations through support teams that proactively stress the importance of adopting the pricing recommendations, for example, during scheduled support calls with IDeaS RMS users.

---

[22] https://ideas.com/science-behind-g3-rms/

84.    IDeaS has constructed its RMS to disincentivize overriding its pricing recommendations. According to an industry-recognized revenue management consultant, IDeaS designed G3 RMS to ensure that "every action in G3 causes a ripple effect on everything else" so, as a result, "users are less inclined to manually override system generated [pricing]."

85.    IDeaS also disincentivizes deviations by tracking manual overrides of pricing recommendations. The following diagram shows an IDeaS RMS interface in which a pricing override is recorded under the "Exceptions" tab:



///

///

///

86. As the diagram above illustrates, when a user overrides a pricing recommendations and prices a hotel room "Below the Last Room Value,"[23] IDeaS catalogs this and creates an "Exception" tab that allocates an exception score to the pricing decision and gives the user ways to "action the Exception." This includes the option of "Suspend[ing] the exception on this date."

87. IDeaS' RMS also includes internal restrictions and controls to disincentive users from lowering prices. For example, according to IDeaS, its system "uses [Last Room Value] as a restriction control for low value rates during busy periods . . .."[24]

88. In the few instances in which Operator Defendants deviate from IDeaS' pricing recommendations, they still use the pricing recommendations as a starting point to set prices. Therefore, even where Operator Defendants do not implement IDeaS' exact pricing recommendations, their agreement to use IDeaS' RMS and pricing algorithm still fixes the starting point of hotel room rates at supra-competitive levels and delegates key aspects of price setting to a shared agent.

89. Operator Defendants also are strongly incentivized to implement IDeaS' pricing recommendations. Operator Defendants spend significant sums of money to purchase and deploy IDeaS' RMS, the central feature of which is IDeaS' pricing recommendations. Operator Defendants would not continue to spend significant sums of money if they were not using IDeaS' pricing recommendations. Likewise, IDeaS' RMS clients would not retain IDeaS at a

---

[23] IDeaS defines "Last Room Value" as "[t]he maximum amount of room revenue a hotel can expect to make from the last room available for sale. The system uses LRV as a restriction control for low value rates during busy periods and opens all rates during slow times." https://ideas.com/tools-resources/hotel-glossary-terms/#letter_L
[24] https://ideas.com/tools-resources/hotel-glossary-terms/#letter_L

98% percent rate unless they were using the product for which they paid—pricing recommendations.[25]

90.   Operator Defendants also know that cooperation is essential to the success of their conspiracy and their ability to impose anticompetitive overcharges. And Operator Defendants are reaping significant benefits from the conspiracy, as during the conspiracy they are generating record revenues via historically high room rates. The Operator Defendants are, therefore, strongly incentivized to continue to adhere to IDeaS' pricing recommendations.

91.   Because IDeaS' RMS and algorithm function as a shared pricing agent for Operator Defendants, they do not need to communicate directly with the other co-conspirator hotel operators. Instead, IDeaS furnishes the information each needs to agree to and effectuate the conspiracy, including the identity of the participating competitors and the prices they are charging.

**D.   Operator Defendants' Parallel Pricing Demonstrates Agreement and Conspiracy.**

92.   Consistent with their participation in the conspiracy, the prices charged by the Operator Defendants have moved in parallel throughout the Class Period.

93.   The following screenshot was taken from an app powered by IDeaS and operated by an Operator Defendant or co-conspirator.[26]   It shows the IDeaS user receiving real-time information about price changes executed by a competing property to which the user responds by implementing identical price changes shortly thereafter.

---

[25] https://ideasservices.wpenginepowered.com/wp-content/uploads/2020/06/IDeaS-G3-RMS-Brochure-EE.pdf
[26] On information and belief, the screenshot came from Defendant Choice's app but Plaintiffs are not yet able to conclusively confirm this.

COMPLAINT



94.     Operator Defendants have engaged in complex and historically unprecedented parallel changes to prices during the conspiracy. Following the pandemic and during the Class Period, the Operator Defendants increased room rental rates to their highest all-time level, surpassing pre-pandemic levels with no equivalent increase in demand, as occupancy levels remained at or below pre-pandemic levels. These unprecedented, simultaneous parallel changes in prices by all Operator Defendants are consistent with a change in pricing strategy that reflects adoption and adherence to IDeaS' recommendations for maximizing RevPAR and ADR, the intended result of the Operator Defendants' agreement and conspiracy to outsource pricing decisions to IDeaS.

95.     The following chart highlights the imbalance between price and demand for the US hotel industry. As the chart demonstrates, the ADR for hotel rooms in the US has increased nearly 20% since before the pandemic and nearly 5% since 2022 even though occupancy is down almost 3% and 1% respectively.[27]

///

///

///

---

[27] https://www.ahla.com/sites/default/files/SOTI.2024.Final_.Draft_.v4.pdf



**2023 Highlights: Predictions vs. Outcomes** CONTINUED

**U.S. Hotels Performance**
Annual, Average

Source: Oxford Economics and STR    ■ 2019   ■ 2022   ■ 2023

**E.    Operator Defendants Engaged in Parallel Pricing Due to the Conspiracy and Not Contemporaneous Independent Conduct.**

96.    Operator Defendants' simultaneous usage of IDeaS' RMS and its pricing algorithm strongly infers that the parallel pricing patterns observed in hotel room rates is the result of a collusive conspiracy rather than the product of independent pricing decisions. "In some situations, the evidence may disclose cooperative conduct among the defendants—such that a 'combination' of competitors joining together their decisionmaking can be inferred from their cooperative actions"—in particular, where there is "an invitation proposing collective action followed by a course of conduct showing acceptance[.]" U.S. Dep't of Justice, Memorandum of Law in Support of the Statement of Interest of the United States, Nov. 15, 2023, In re: RealPage, Rental Software Antitrust Litigation (No. II), No. 3:23-MD-3071 (M.D. Tenn.), ECF No. 628 (urging denial of motions to dismiss Section 1 claims alleging a scheme by a group of owners of rental housing to outsource their pricing decisions to an RMS offered by RealPage, Inc.).

97.     IDeaS' RMS and algorithm provide the Operator Defendants with a forum offering a ready and continuing opportunity to collude. Once the express invitation to collude made by IDeaS in its marketing materials was accepted, Operator Defendants gained unlimited opportunities to collude as participants on the platform and in various user-group forums offered by IDeaS. IDeaS directly coordinates user-only events for the purpose of "directly engag[ing] with [] clients as [they] continue to shape the future of hospitality—together."[28]

98.     The Operator Defendants also attended other user meetings and summits run, sponsored, or promoted by IDeaS. According to IDeaS, these client summits are intended to provide the co-conspirator hotel operators with "insights and best practices on optimizing multi-unit revenue management performance; the power of analytics and how best prices are determined; [...] to showcase how IDeaS consolidates hotel data to deliver total profit optimization."[29]   IDeaS bestows awards to its clients at these meetings for the purpose of "honoring individuals for their collaboration, partnership, bold thinking and mutual support of progress and innovation."[30]

99.     For example, IDeaS hosts multiple "Converge" revenue summits each year. For its June 2024 conference in Miami, Florida, IDeaS proudly tells attendees that they will "Join 300+ Global Hospitality Executives to Discuss the Future of Revenue Management."

100.     IDeaS is also a preferred partner, sponsor, and/or presenter at conferences regarding hotel revenue management. For example, IDeaS is a sponsor and presenter at the "Navigate" conference in April 2024, which is attended by executives from several of the top hotel operators. Jeff Roark, Director of Sales at IDeaS, is presenting on the following topic:

---

[28] https://www.hospitalitynet.org/news.
[29] https://www.hospitalitynet.org/news/4111666.html#:~:text=insights%20and%20best,total%20profit.
[30] https://ideas.com/client-award-recipients.

"Maximize your revenue potential: Exploring the power of AI in revenue optimization presented by IDeaS."[31]

101.    Through the actions described herein, Operator Defendants have been and are acting against their economic self-interests but-for the conspiracy. Operator Defendants could not have profitably implemented the pricing recommendations from IDeaS unless their co-conspirators were doing the same. As explained above, Operator Defendants are charging record-high prices without a corresponding increase in occupancy (demand) to justify the prices, leading to record profits. Acting independently, the Operator Defendants would not and could not profitably implement this strategy because competitors would undercut the supra-competitive prices and the Operator Defendants would lose revenue.

102.    Similarly, it would be against the Operator Defendants' self-interest to share confidential information with IDeaS but-for the conspiracy.  Operator Defendants send IDeaS a significant amount of non-public, transaction level data on prices and occupancy. They do so knowing IDeaS sends this information directly to competitors and uses it to calculate pricing recommendations for competitors. If they were not engaged in a conspiracy in which they were receiving the same information from competitors, then Operator Defendants would be competitively disadvantaged by providing this data and would not do so.

103.    The Operator Defendants have strong incentives to collude. Hotel operators suffered unexpected and massive reductions in revenue during the Covid-19 pandemic. In 2020 alone, hotel industry revenue dropped by nearly 50%. Operator Defendants, therefore, had a unique and strong motive to conspire during the Class Period.

104.    IDeaS also presents Operator Defendants with a strong motive to collude. IDeaS claims to increase revenue for hotel operators by 8-15% by engaging in the conspiracy alleged

---

[31] https://www.revinate.com/navigate/2024-miami/agenda/

herein. Additionally, the more faithfully co-conspirators adopt IDeaS' pricing recommendations, the more revenue and profit each will earn.

105.  The dynamics of the hotel room rental industry further contribute to the conspiracy. Hotel operators face incredibly high barriers to entry and expansion. Any party seeking to enter the hotel market must have significant time and financial resources. It costs tens of millions or hundreds of millions of dollars to construct a hotel. And it takes several years to acquire the necessary approvals and permits from state and local governments to build a hotel. Hotel operators seeking to expand face similar barriers, as significant expansion also costs millions of dollars and often requires additional government approvals and permits.

106.  Demand for hotel rooms is inelastic. Consumers generally rent hotel rooms because they are traveling to a specific location for an event or attraction and are only willing to travel a limited distance from their hotel to the event or attraction. Consumers' choices are, therefore, limited to hotels in the general vicinity of the event or attraction. As a result, hotel markets are susceptible to, and cannot discipline against, cartel price fixing.

**F.    Federal Antitrust Authorities Have Identified the Harm Caused by this Form of Algorithmic Pricing.**

107.  Federal antitrust regulators have described in detail the concerns raised by the type of algorithmic pricing platform alleged here. The former Acting Chair of the Federal Trade Commission, Maureen Ohlhausen, described how using shared price-setting algorithms by competitors is precisely the type of agreement prohibited by antitrust law, including where the pricing decisions are outsourced to a third-party, and provided the following hypothetical:

> What if algorithms are not used in such a clearly illegal way, but instead effectively become a clearing house for confidential pricing information? Imagine a group of competitors sub-contracting their pricing decisions to a common, outside agent that provides algorithmic pricing services. Each firm communicates its pricing strategy to the vendor, and the vendor then programs its algorithm to reflect the firm's pricing strategy. But because the same outside vendor now has confidential price strategy information from multiple competitors, it can program its algorithm to maximize industry-wide pricing. In effect, the firms themselves

don't directly share their pricing strategies, but that information still ends up in common hands, and that shared information is then used to maximize market-wide prices.

Again, this is fairly familiar territory for antitrust lawyers, and we even have an old fashioned term for it, the hub-and-spoke conspiracy. Just as the antitrust laws do not allow competitors to exchange competitively sensitive information directly in an effort to stabilize or control industry pricing, they also prohibit using an intermediary to facilitate the exchange of confidential business information.

Let's just change the terms of the hypothetical slightly to understand why. Everywhere the word "algorithm" appears, please just insert the words "a guy named Bob."

Is it ok for a guy named Bob to collect confidential price strategy information from all the participants in a market, and then tell everybody how they should price? If it isn't ok for a guy named Bob to do it, then it probably isn't ok for an algorithm to do it either.[32]

108.    IDeaS here is "Bob" in the hypothetical. IDeaS collects confidential information from each Operator Defendant and then uses that information to generate pricing recommendations, which Operator Defendants consistently implement.

109.    Likewise, in the DOJ Memorandum of Interest in RealPage, the DOJ explained that Section 1 of the Sherman Act condemns collaborations that eliminate independent decision making in the market—regardless of how they are brought about. This includes prohibiting "competitors from fixing prices by knowingly sharing their competitive information with, and then relying on pricing decisions from, a common human pricing agent who competitors know analyzes information from multiple competitors. The same prohibition applies where, as here, the common pricing agent is a common software algorithm."[33]  Based on its analysis, the DOJ

---

[32] Maureen K. Ohlhausen, *Should We Fear The Things That Go Beep In the Night? Some Initial thoughts on the Intersection of Antitrust law and Algorithmic Pricing*, Federal Trade Commission (May 23, 2017),
*https://www.ftc.gov/system/files/documents/public_statements/1220893/ohlhausen_-_concurrences_5-23-17.pdf

[33] U.S. Dep't of Justice, Memorandum of Law in Support of the Statement of Interest of the United States, Nov. 15, 2023, *In re: RealPage, Rental Software Antitrust Litigation (No. II)*, No. 3:23-MD-3071 (M.D. Tenn.), ECF No. 628.

concluded that this type of behavior was per se unlawful under Section 1 of the Sherman Act. The Operator Defendants and IDeaS are engaging in precisely such conduct here.

110.    Then, in the casino-hotel pricing algorithm case, the DOJ very recently filed a Statement of Interest of the United States that stressed "Algorithmic Price Fixing is a Per Se Violation of Section 1," including when hotel-operators use a third-party algorithm to establish the starting point of prices.[34]  The DOJ explained that, under longstanding and well-established Supreme Court precedent, concerted action can be alleged by showing defendants knew "concerted action was contemplated and invited" and "the [competitors] gave their adherence to the scheme and participated in it." The DOJ also wrote to ensure the court understood two important concepts relevant to the case: (1) Section 1 reaches tacit as well as express agreements, and it prohibits competitors from delegating key aspects of pricing decision-making to a common entity, even if the competitors never communicate with one another directly; and (2) an agreement among competitors to fix the starting point of pricing is per se unlawful even if the prices the competitors ultimately charge deviate from that starting point, such as those instances in which hotel-operators use algorithmic pricing recommendations as the starting point when setting prices.

### G.    Defendants' Conspiracy Harms Consumers and Competition

111.    Defendants' agreements, conspiracy, and collusive conduct substantially injures competition in the Relevant Sub-markets. Instead of making independent decisions on prices and occupancy rates, the Operator Defendants and their co-conspirators have outsourced these decisions to IDeaS as a common decision-maker, thereby eliminating price competition in the Relevant Sub-markets and enabling the Operator Defendants to charge supra-competitive prices.

---

[34] U.S. Dep't of Justice, Statement of Interest of the United States, Mar. 28, 2024, Cornish-Adebiyi, et al., v. Caesars Entertainment, Inc., et al., Case No. 1:23-cv-02536-KMW-EAP (D. N.J.), ECF No. 96.

As a result, Plaintiffs and Class Members have paid and are paying higher prices for hotel rooms than they otherwise would pay had Defendants not engaged in their conspiracy.

112.    IDeaS repeatedly touts that use of its RMS and algorithm will lead to significantly more revenue for hotel operators than they would generate under normal market conditions. According to IDeaS, hotel operators using its RMS and pricing algorithm earn 15% higher revenues on average compared to hotel operators that do not use a revenue management solution.

113.    IDeaS users also admit they have been able to charge significantly higher prices enabled by their use of IDeaS' RMS. According to Stefano Fusaro, Assistant Hotel Manager at the Grand Hotel Minerva, "we sold rates that I would have never published if I hadn't been working with IDeaS. In August, for example, we had revenues +16% versus last year and 8% over budget."

114.    Furthermore, through its use of disaggregated, non-public data from multiple competitors, IDeaS can identify demand characteristics that allow it to suggest room prices that may seem to contradict common economic intuition. For example, one hotel operator explained how IDeaS' RMS in one instance allowed them to sell smaller hotel rooms at higher rates than larger rooms with more amenities because IDeaS detected a surge in demand for the smaller rooms.

115.    The harm to competition and injury to consumers alleged herein will worsen over time. IDeaS' algorithm is constantly learning, thereby becoming more adept at setting supra-competitive prices as it receives additional data. Therefore, as long as users continue to provide IDeaS with non-public, transaction-level data, the algorithm's recommended prices will become increasingly effective at overcharging hotel guests.

///

///

VI.   **MARKET DEFINITION**

116.   Defendants' actions described herein constitute an unlawful conspiracy to fix, raise, stabilize, or maintain artificially high rental prices for hotel guest rental rooms across the United States and is, therefore, per se illegal under Section 1 of the Sherman Act.

117.   If the Court declines to apply the per se rule, then the conduct alleged herein should be condemned upon a quick look analysis given the obvious anticompetitive effects of Defendants' conspiracy to fix hotel room rental prices. Under either the per se or quick look standard, Plaintiffs need not prove that Defendants had market power in any defined antitrust market.

118.   To the extent the Court analyzes the claim under the rule of reason, the relevant product market is the market for hotel room rentals by the public.

119.   The relevant geographic markets are: the Atlanta–Sandy Springs–Roswell, GA MSA; the Baltimore–Columbia–Towson, MD MSA; the Boston-Cambridge-Newton, MA-NH MSA; the Chicago-Naperville-Elgin, IL-IN-WI MSA; the Dallas-Fort Worth-Arlington, TX MSA; the Houston-Pasadena-The Woodlands, TX MSA; the Las Vegas-Henderson-North Las Vegas, NV MSA; the Los Angeles-Long Beach-Anaheim, CA MSA; the Miami-Fort Lauderdale-West Palm Beach, FL MSA; the New Orleans-Metairie, LA MSA; the New York-Newark-Jersey City, NY-NJ MSA; the Orlando-Kissimmee-Sanford, FL MSA; the San Francisco–Oakland–Fremont, CA MSA; the Seattle-Tacoma-Bellevue, WA MSA; and the Washington-Arlington-Alexandria, DC-VA-MD-WV MSA.

120.   Operator Defendants and their co-conspirators collectively have market power in each of the Relevant Sub-markets. Operator Defendants Hilton, Choice and Wyndham are three of the five largest hotel operators in the U.S., which is significant given that the U.S. hotel market is concentrated. Operator Defendants Hyatt, Four Seasons, and Omni and co-conspirator Accor are also sizeable participants in the Relevant Sub-markets. Beyond these participants,

36

IDeaS provides pricing recommendations to tens of thousands of other properties in the U.S., generating tens of millions of booking recommendations daily.

121.    MSAs are core-based statistical areas associated with at least one urban area that has a population of at least 50,000. The MSA comprises the central county or counties or equivalent entities containing the core, plus adjacent outlying counties having a high degree of social and economic integration with the central county, or counties as measured through commuting.

122.    The Relevant Sub-markets include all reasonable substitutes. Consumers do not consider hotel rooms outside of a Relevant Sub-market to be a substitute for hotel rooms inside a Relevant Sub-market. Industry experts recognize that hotels are differentiated products based on location. Each Relevant Sub-market is a major US metropolis offering unique attractions. Consumers stay in hotels in these cities and pay the available rates because they want to stay in that specific location. Stated differently, consumers who are indifferent to location do not stay in hotels in the Relevant Sub-markets and opt instead for lower cost options in smaller cities. A consumer faced with a small but significant non-transitory increase in price (a "SSNIP") in a Relevant Sub-market would not switch to a hotel located outside of that market. A family visiting Chicago, for example, would not switch to a hotel in Champaign, Illinois in response to a SSNIP.

123.    Consumers also do not consider other short-term rental options as substitutes for hotel rooms. Hotels offer a unique bundle of location, amenities, and services not available from platforms such as Airbnb or Vrbo that offer short-term residential rentals. Because hotels offer a different product than other short-term rental options, industry participants do not consider hotels to be the direct competitors of other short-term rental options. Notably, in spite of price increases in the Relevant Sub-markets over the past couple of years that were far greater than the five percent magnitude assumed in the standard SSNIP exercise, consumers did not switch

37

to other short-term rental options in numbers large enough to make these price increases unprofitable. Thus, consumers would not switch to other short-term rental options if faced with a SSNIP in hotel room rates in the Relevant Sub-markets.

124.     While Plaintiffs have identified the foregoing Relevant Sub-markets, they anticipate that discovery and expert analysis will lead to the addition of additional markets because Operator Defendants operate nationwide.

## VII.   CLAIM

### COUNT I

### <u>Violation of the Section 1 of the Sherman Act</u>
**(On Behalf of Classes for Injunction and Equitable Relief and Compensatory Damages)**

125.     Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint as though fully set forth herein.  They seek equitable and injunctive relief on behalf of the National Class and trebled damages on behalf of the Rental Class.

126.     Beginning at a time unknown to Plaintiffs but at least since April 26, 2020, Defendants engaged in an ongoing agreement, contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act.

127.     Defendant IDeaS created and operated its RMS, which applies an algorithm that analyzes data and generates pricing recommendations. IDeaS agreed with Operator Defendants to generate pricing recommendations using non-public, competitively sensitive, real-time price and output data provided by the Operator Defendants, co-conspirator hotel operators, and other sources. Operator Defendants agreed among themselves and with their co-conspirators to (i) provide Defendant IDeaS with competitively sensitive, non-public, real-time data concerning pricing and occupancy for every transaction, knowing that this information would be shared

with competitors and analyzed with their competitors' data to generate pricing recommendations for each Operator Defendant and co-conspirator; and (ii) implement the pricing recommendations generated by IDeaS. Defendants also agreed to disseminate Operator Defendants' and co-conspirators' non-public, competitively sensitive data among competitors.

128.    Defendants' combination or conspiracy has harmed competition nationally and in the Relevant Sub-markets and has caused anticompetitive effects that include supra-competitive prices and lower rates of occupancy. As a direct and proximate result of Defendants' unlawful combination or conspiracy, Plaintiffs and Class Members have been injured and will continue to be injured by paying more for hotel rooms than they would otherwise pay in a fully competitive market not harmed by the anticompetitive effects of Defendants' conspiracy. The economic harm suffered by Plaintiffs and the Class Members constitutes antitrust injury.

129.    Plaintiffs and Class Members are entitled to treble damages, attorneys' fees and costs, and injunctive relief enjoining Defendants from engaging in the violations alleged herein.

130.    Defendants' alleged conduct violates Section 1 of the Sherman Act, 15 U.S.C. § 1.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on for themselves and on behalf of the Classes of all others similarly situated, respectfully requests judgment against Defendants and the following relief:

A.    An Order determining that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives, and appoint counsel of record as Class Counsel;

B.    A finding that Defendants violated Section 1 of the Sherman Act by engaging in the contract, combination and conspiracy alleged herein;

C.  An award of damages to Plaintiffs and Class Members, including statutory treble damages, compensatory damages, punitive damages, and pre- and post-judgment interest to the extent permitted by law;

D.  An Order temporarily enjoining Defendant IDeaS from collecting competitively sensitive information from market participants and disseminating that information to competitors, either directly or through pricing recommendations incorporating such information;

E.  An Order temporarily enjoining Operator Defendants from delegating or outsourcing their pricing decisions to IDeaS;

F.  An Order permanently enjoining Defendant IDeaS from collecting competitively sensitive information from market participants and disseminating that information to competitors, either directly or through pricing recommendations incorporating such information;

G.  An Order permanently enjoining Operator Defendants from delegating or outsourcing their pricing decisions to IDeaS;

H.  An Order awarding Plaintiffs attorney's fees, expenses, and taxable costs to the extent permitted by law; and

I.  Such other further relief as the Court deems just and proper to protect the private and medical information of Plaintiff and the Class Members.

///
///
///
///
///
///
///

COMPLAINT

## IX.    JURY DEMAND

Plaintiffs demand trial by jury of all issues so triable as of right.

DATED: April 26, 2024

**MOGINRUBIN LLP**

_/s/ Daniel Mogin_

Daniel J. Mogin (SBN 95624)
Timothy Z. LaComb (SBN 314244)
4225 Executive Square, Suite 600
La Jolla, CA 92037
Telephone:    (619) 687-6611
Facsimile:     (619) 687-6610
dmogin@moginrubin.com
tzlacomb@moginrubin.com

Jonathan L. Rubin
2101 L Street NW, Suite 300
Washington, DC 20037
Telephone:   (202) 630-0616
jrubin@moginrubin.com
*Pro Hac Vice Application Forthcoming

**JOSEPH SAVERI LAW FIRM, LLP**
Joseph R. Saveri (SBN 130064)
Cadio Zirpoli (SBN    179108)
Christopher K. L. Young (SBN 318371)
Kevin E. Rayhill (SBN 267496)
601 California Street, Suite 1000
San Francisco, CA 94108
Telephone: (415) 500-6800
jsaveri@saverilawfirm.com
czirpoli@saverilawfirm.com
cyoung@saverilawfirm.com
krayhill@saverilawfirm.com

**DON BIVENS PLLC**
Don Bivens
15169 N. Scottsdale Road, Suite 205
Scottsdale, AZ 85254
Telephone:    (602) 708-1450
don@donbivens.com
*Pro Hac Vice Application Forthcoming

*Attorneys for Plaintiffs*