UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HANSON DAI, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>SAS INSTITUTE INC., et al.,<br><br>    Defendants. | Case No. 24-cv-02537-JSW<br><br>**ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND AND SETTING CASE MANAGEMENT CONFERENCE**<br><br>Re: Dkt. No. 100 |

This matter comes before the Court upon consideration of the motion to dismiss filed by IDeaS, Inc. ("IDeaS"), Wyndham Hotels & Resorts, Inc., Hilton Domestic Operating Company Inc., Four Seasons Hotels Limited, Omni Hotels Management Corporation ("Omni"), and Hyatt Corporation (collectively the "Hotel Defendants").[1] The Court has considered the parties' papers, relevant legal authority, the record in this case, and GRANTS the motion, with leave to amend.

**BACKGROUND**

Plaintiffs allege that the Hotel Defendants and IDeaS conspired to fix hotel room prices nationwide and in seventeen sub-markets, in violation of Section 1 of the Sherman Act. IDeaS "is the dominant provider of revenue management and profit optimization software ['RMS'] and services for hotel operators." (Dkt. No. 86, Consolidated Complaint ("Compl.") ¶ 21.) The Hotel Defendants use IDeaS's RMS to set their room prices. (*Id.* ¶¶ 22-26.)

> To effectuate the conspiracy, each [Hotel] Defendant agreed to provide IDeaS with a continuous stream of non-public, competitively sensitive price and occupancy information in real time

---

[1] SAS also joined in this motion to dismiss. The Court granted its separate motion to dismiss, but the analysis herein will apply to any amended claims Plaintiffs assert against SAS.

1

> or near real time, knowing that their horizontal competitors are also sharing their competitively sensitive price and occupancy information in real time or near real time, giving IDeaS a clear and unparalleled view of competitive conditions nationwide and in the Relevant Sub-markets. This includes non-public information such as the price paid by consumers for each room, the quantity of rooms available by room type, whether or not any consumers attempted to book a room that was no longer available, and room rates not visible to the public. IDeaS plugs this confidential information into its algorithm and generates supra-competitive pricing recommendations for each [Hotel] Defendant, which the [Hotel] Defendants then implement in nearly every instance. The [Hotel] Defendants know their horizontal competitors are also implementing IDeaS's supra-competitive pricing because IDeaS tells them so[.]

(*Id.* ¶ 2; *see also id.* ¶¶ 22-26 (each Hotel Defendant "provided IDeaS with non-public, competitively sensitive, real-time pricing and occupancy data and received the same information from IDeaS regarding competitors, directly and/or as an input in pricing recommendations from IDeaS").) Plaintiffs allege that IDeaS' algorithm constantly improves its ability to recommend supra-competitive prices "by continually learning and correcting itself using the data provided by participants (which includes non-public, competitively sensitive, real-time data on pricing and occupancy)." (*Id.* ¶ 52; *see also id.* ¶ 66 (describing types of non-public data provided).)

For example, Plaintiffs allege that IDeaS' G3 RMS product has a dashboard that provides users direct access to non-public information that identifies when a specific competitor alters its price and specifies the exact amount of the price change. (*Id.* ¶ 72.) "By providing real-time or near real-time visibility into horizontal competitors' pricing, IDeaS' RMS enables the [Hotel] Defendants to ensure that their own pricing keeps pace with their co-conspirators' supra-competitive pricing and enforces discipline on any co-conspirators who attempt to gain market share by underpricing the other" Hotel Defendants. (*Id.*) Plaintiffs also allege that IDeaS shares non-public information indirectly by automatically adjusting pricing recommendations using demand forecasts. (*Id.* ¶ 73.)

The Court will address additional allegations as necessary in the analysis.

//

//

2

## ANALYSIS

### A. Applicable Legal Standards.

On a Rule 12(b)(6) motion, the Court assumes "that all the allegations in the complaint are true[.]" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A plaintiff's obligation to provide the "grounds" of their "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.] … Factual allegations must be enough to raise a right to relief above the speculative level[.]" *Id.* "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

If a plaintiff fails to state a claim, a court generally should grant leave to amend. *See, e.g., Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296 (9th Cir. 1990); *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 246-47 (9th Cir. 1990).

### B. Plaintiffs Fail to Plausibly Allege a Horizontal Agreement.

Section 1 of the Sherman Act prohibits any "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. In order to state a claim, Plaintiffs must allege facts that show (1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, … (3) which actually injures competition." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008).[2]

Defendants have not challenged the allegations that the Hotel Defendants have an agreement with IDeaS to use its RMS products, and Plaintiffs do not rely on direct evidence to establish an agreement between and among the Hotel Defendants. They argue the allegations are sufficient to infer a horizontal agreement because "[a]cceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried

---

[2] Defendants do not argue that the Plaintiffs lack antitrust standing. *See R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 809 F.2d 135, 145 (9th Cir. 1989) (antitrust standing is an essential element of a Sherman Act claim).

out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act." *Interstate Circuit v. United States*, 306 U.S. 208, 227 (1939); *see also United States v. Masonite Corp.*, 316 U.S. 265, 275 (1942) (finding agreement to fix prices even though it was "not clear at what precise point of time each [defendant] became aware of the fact that its contract was not an isolated transaction but part of a larger arrangement" but was "clear that as the arrangement continued each [defendant] became familiar with its purpose and scope"). *Interstate Circuit* and *Masonite* provide the foundation for Plaintiff's theory of a hub-and-spoke conspiracy, the key features of which are a hub, spokes that have a vertical agreement with the hub and a rim of "horizontal agreements among the spokes." *In Re Musical Instruments & Equipment Antitrust Litig.*, 798 F.3d 1186, 1192 (9th Cir. 2015).

Pursuant to *Twombly*, Plaintiffs must include "enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage," but allegations "of parallel conduct and a bare assertion of conspiracy will not suffice." *Twombly*, 550 U.S. at 556. "Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 557; *see also In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 47 (9th Cir. 2022) ("[T]o state a plausible Section 1 claim, plaintiffs must include additional factual allegations that place that parallel conduct in a context suggesting a preceding agreement."). Plus factors may vary but usually consist of "economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." *In re Musical Instruments*, 798 F.3d at 1194.

The facts underlying Plaintiffs' claim, are novel but not without precedent. A number of recent decisions have examined whether the use of the same RMS software by competitors amounts to price fixing, with mixed results. *See, e.g., Duffy v. Yardi Systems, Inc.*, 758 F. Supp. 3d 1283 (W.D. Wash. 2024) (denying motion to dismiss); *Cornish-Adebiyi v. Caesars Entm't, Inc.*, No. 1:23-CV-02536-KMW-EAP, 2024 WL 4356188 (D.N.J. Sept. 30, 2024) (granting

4

motion to dismiss amended complaint with prejudice); *Gibson v. Cendyn Grp., LLC*, No. 2:23-cv-00140-MMD-2JA, 2024 WL 2060260 (D. Nev. May 8, 2024) (granting motion to dismiss amended complaint with prejudice) ("*Gibson II*"); *Gibson v. MGM Resorts Int'l*, No. 2:23-cv-00140-MMD-DJA, 2023 WL 7025996 (D. Nev. Oct. 24, 2023) (granting motion to dismiss with leave to amend); *In re RealPage, Inc., Rental Software Antitrust Litig.*, 709 F. Supp. 3d 478 (M.D. Tenn. 2023) (dismissing claims in part).

### 1. Plaintiffs do not sufficiently allege parallel conduct.

Plaintiffs allege that the Hotel Defendants engaged in parallel conduct when they began to use IDeaS' RMS and to charge allegedly supra-competitive rates based on IDeaS's recommendations. (*See, e.g.,* Compl. ¶ 92.) In *In re Real Page*, a group of plaintiffs who leased multifamily units from the defendants relied on statements from individual defendants and regression analyses to plead that after a "critical level of RealPage RMS adoption had been reached," the defendants changed their strategy and increased prices "regardless of apartment vacancies or market downturns." *Id.* at 504, 506. Although the defendants did not act simultaneously, the court found the multifamily plaintiffs' allegations were sufficient to show parallel conduct. *Id.* at 507.

In contrast, in *Gibson I,* the plaintiffs did not include allegations about when the defendants began to use the defendant's RMS. 2023 WL 7025996, at *4. The *Gibson* court reasoned the lack of such information and the lack of information about which systems the defendants used prevented it from plausibly inferring parallel conduct. *Id.* It also noted that although the plaintiffs included general allegations of the acceptance rate for the price recommendations, they did not allege facts about the rate at which the *defendants* accepted the recommendations. *Id.*, at *3; *see also Gibson II*, 2024 WL 2060260, at *5 (finding allegations did not render horizontal agreement plausible where defendants began to use software at different times "over an approximately 10-year period" and "never agreed to charge the prices [RMS] recommended").

"The available case law does not suggest any firm temporal limitation on" pleading parallel conduct. *Jones v. Micron Tech.*, 400 F. Supp. 3d 897, 916 (N.D. Cal. 2019) (citing

5

*Interstate Circuit*, 306 U.S. at 227). However, like the plaintiffs in the *Gibson* cases, Plaintiffs neither include facts about when any of the named Hotel Defendants began to "outsource" their pricing decisions to IDeaS nor include facts about when they began to make the "complex and historically unprecedented changes" to their room prices. (*See* Compl. ¶ 93 (chart showing "imbalance between price and demand for the US hotel industry" in general). Plaintiffs also allege that "Operator Defendants adopt IDeaS' pricing recommendations in nearly every instance," but the facts supporting that allegation relate to non-party Choice Hotels. (Compl. ¶ 77.) That allegation "is … not reflective of the Hotel [Defendant's] acceptance rate." *Gibson I,* 2023 WL7025996, at *3.

Plaintiffs need not allege that each Hotel Defendant acted at the exact same moment in time or at the exact same acceptance rate, but the Court concludes they must plead additional facts to render the allegations of parallel conduct plausible.

### 2. Plaintiffs also do not sufficiently allege plus factors.

Plaintiffs rely on several plus factors to support their position that the Hotel Defendants agreed to fix prices. The Court examines the allegations supporting each factor in turn and then considers them cumulatively. *In re Musical Instruments*, 798 F.3d at 1194.

First, Plaintiffs argue the Hotel Defendants had an invitation to collude as well as the motive and the opportunity to do so. Plaintiffs allege the Hotel Defendants would have been motivated by the impacts of the COVID-19 pandemic, but they do not include any facts about how the pandemic impacted the Hotel Defendants rather than the hotel industry in general or why such a motive would be more indicative of collusion than market interdependence. *See In re Musical Instruments*, 798 F.3d at 1194-95. Plaintiffs also include allegations that IDeaS hosted events and summits for its users but again do not include any facts showing a named Hotel Defendant attended one of those events. *Jones*, 400 F. Supp. 3d at 917-18 (noting plaintiffs did not allege defendants' attendance at trade shows correlated with alleged price increases). Assuming the Hotel Defendants attended those events, Plaintiffs do not include any allegations about what agreements were made, if any. "[M]ere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement." *In*

6

*re Musical Instruments*, 798 F.3d at 1196.

Second, Plaintiffs argue and allege the hotel market is conducive to price fixing because there are high barriers to entry and expansion and demand for hotel rooms is inelastic. (*See* Compl. ¶¶ 103-104.) These factors can be indicative of collusion. *See, e.g., In re Cal. Bail Bond Antitrust Litig.*, 511 F. Supp. 3d 1031, 1046 (N.D. Cal. 2021) (citing cases). In this case, when the Court examines the plus factors holistically, the Court concludes this factor is not strong enough on its own to nudge Plaintiffs' claims of a horizontal agreement across the line from possible to plausible. *Twombly*, 550 U.S. at 547.

Finally, Plaintiffs argue the Hotel Defendants acted against their self-interest by providing IDeaS with their confidential information knowing it would be shared with their competitors. The courts considering similar cases have found the exchange of confidential information to be a decisive factor in their analyses. In *In re Real Page*, the court reasoned, based on allegations that are more detailed than those here, that the "most persuasive evidence of horizontal agreement is the simple undisputed fact that each RMS Client Defendant provided RealPage its proprietary commercial data, knowing that RealPage would require the same from its horizontal competitors and use all of that data to recommend rental prices to its competitors." 709 F. Supp. 3d at 510; *see also Duffy*, 758 F. Supp. 3d at 1292-92 (finding allegations sufficient where plaintiffs alleged RMS defendant's works "only if each lessor [defendant] divulges confidential and commercially sensitive pricing information" and "de-prioritized occupancy in favor of algorithmic pricing").

In *Cornish-Adebyi*, the court noted the "[p]laintiffs repeatedly and emphatically emphasize that the Casino-Hotels 'knowingly provided' their 'non-public room and pricing and occupancy data' to the" RMS. 2024 WL 4356118, at *5. The court reasoned that the plaintiffs fell short of stating a claim because their allegations did not show data was "pooled or otherwise comingled into a common dataset against which the algorithm runs." *Id.*, at *5; *accord Gibson II*, 2024 WL 2060260, at *4 (dismissing because plaintiffs failed to plausibly allege exchange of confidential information).

Plaintiffs highlight the importance of the exchange and use of confidential information in the Complaint by relying on the following quote from a former Acting Chair of the Federal Trade

7

Commission: "Each firm communicates its pricing strategy to the vendor, and the vendor then programs its algorithm to reflect the firm's pricing strategy. But because the same outside vendor now has *confidential* price strategy information from multiple competitors, it can program its algorithm to maximize industry-wide pricing." (Compl. ¶ 105 (emphasis added).) However, Plaintiffs' allegations that each Hotel Defendant provides IDeaS with confidential information and that IDeaS uses or pools that information in its algorithms are conclusory.

For example, they allege that the Hotel Defendants provide their confidential information to IDeaS, which "plugs this confidential information into its algorithm" to generate supra-competitive pricing recommendation for each Hotel Defendant. (Compl. ¶ 2.) The *Gibson* court found similar allegations lacking. *See, e.g.*, *Gibson I,* 2023 WL 7025996, at *5 (finding statements "conclusory" and "vague"). The *Gibson I* court also reasoned that the plaintiffs' allegations showed "confidential information is fed in, but less clearly out, of the algorithms." *Id.* (finding allegations from confidential witness insufficient to plausibly allege use and exchange of confidential information).

When Plaintiffs here provide more detail, the facts are insufficient to permit the Court to reasonably infer an exchange of confidential information. For example, Plaintiffs allege that IDeaS publicizes it accounts for competitor pricing in "optimization," but there are no facts to make it reasonable to infer the competitor pricing is based on non-public information. (*See also id.* ¶¶ 70-71 (noting IDeaS RMS uses "search penetration, competitor rates, booking trends and reputation scores" but no facts to suggest that information is drawn from non-public sources).

Looking at each of the plus factors individually and holistically, the Court concludes that, as drafted, Plaintiffs' allegations are more analogous to *Cornish-Adeybi* and the *Gibson* cases than to *In re Real Page* and *Duffy*.

Accordingly, the Court GRANTS Defendants' motion to dismiss on the basis that Plaintiffs have failed to allege the horizontal agreement necessary to state a Sherman Act claim. In light of this ruling, the does not reach Defendants' additional arguments.

**CONCLUSION**

The Court GRANTS Defendants' motion to dismiss. Because the Court cannot say it

8

would be futile, the Court GRANTS Plaintiffs leave to amend. Plaintiffs shall file an amended complaint by no later than August 25, 2025. Defendants shall answer or move to dismiss by September 15, 2025. The Court parties shall appear for a case management conference on October 10, 2025 at 9:00 a.m. and shall file a case management conference statement by October 3, 2025.

**IT IS SO ORDERED**.

Dated: July 18, 2025

_____
JEFFREY S. WHITE
United States District Judge