**MOGIN LAW LLP**
Daniel J. Mogin (SBN 95624)
Timothy Z. LaComb (SBN 314244)
4225 Executive Square, Suite 600
La Jolla, CA 92037
Telephone:    (619) 687-6611
dmogin@moginlawllp.com
tlacomb@moginlawllp.com

**JOSEPH SAVERI LAW FIRM, LLP**
Joseph R. Saveri (SBN 130064)
Cadio Zirpoli (SBN    179108)
Christopher K. L. Young (SBN 318371)
Kevin E. Rayhill (SBN 267496)
601 California Street, Suite 1000
San Francisco, CA 94108
Tel (415) 500-6800
jsaveri@saverilawfirm.com
czirpoli@saverilawfirm.com
cyoung@saverilawfirm.com
krayhill@saverilawfirm.com
*Attorneys for Plaintiffs*
*Additional counsel on signature page*

**HARTLEY LLP**
Jason S. Hartley (SBN 192514)
Jason M. Lindner (SBN 211451)
101 West Broadway, Suite 820
San Diego, California 92101
Telephone: (619) 400-5822
hartley@hartleyllp.com
lindner@hartleyllp.com

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HANSON DAI, MAX CHISWICK, ADOLPH ROBLES, STEVEN STACK, MATTHEW GILBERT, MICHAEL MOLINARO, TONY QIAN, MARK LESTER, STEVEN SHATTUCK, and JOEL KAMISHER,<br><br>        Plaintiffs,<br><br>        vs.<br><br>IDEAS, INC., WYNDHAM HOTELS & RESORTS, INC., HILTON DOMESTIC OPERATING COMPANY INC., FOUR SEASONS HOTELS LIMITED, OMNI HOTELS MANAGEMENT, HYATT CORPORATION,<br><br>        Defendants. | Case No: 4:24-cv-02537-JSW<br><br>**FIRST AMENDED CONSOLIDATED COMPLAINT FOR:**<br><br>(1) Violation of Sherman Act, § 1<br><br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs HANSON DAI, MAX CHISWICK, ADOLPH ROBLES, STEVEN STACK, MATTHEW GILBERT, MICHAEL MOLINARO, TONY QIAN, MARK LESTER, STEVEN SHATTUCK, and JOEL KAMISHER, individually and on behalf of the Class of all persons similarly situated, (defined below) seek to recover treble damages, injunctive relief and other relief as appropriate for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, against Defendants IDEAS INC., ("IDeaS"), and WYNDHAM HOTELS & RESORTS, INC., HILTON DOMESTIC OPERATING COMPANY INC., FOUR SEASONS HOTELS LIMITED, OMNI HOTELS MANAGEMENT CORPORATION, and HYATT CORPORATION, (collectively, "Operator Defendants"; collectively with IDeaS, "Defendants"). Plaintiffs' allegations are based on personal knowledge as to the facts pertaining to themselves and upon information and belief as to all other matters, and upon the investigation of counsel. The factual allegations made herein have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. Much of the information underlying the alleged conspiracy has been intentionally kept confidential by Defendants and their co-conspirators and remains exclusively in their possession and control. Plaintiffs allege as follows:

## I.    NATURE OF THE ACTION

1.    Operator Defendants are horizontal competitors and several of the largest hotel operators in the U.S. Rather than compete on price, Operator Defendants agreed, conspired, and/or combined to fix, raise, and stabilize hotel room rental prices nationally and in the Relevant Sub-markets in violation of Section 1 of the Sherman Act (15 U.S.C. § 1). [1] The Operator

---

[1] The Relevant Sub-markets are the markets for hotel room rentals in the following locations: the Atlanta–Sandy Springs–Roswell, GA MSA; the Baltimore–Columbia–Towson, MD MSA; the Boston-Cambridge-Newton, MA-NH MSA; the Chicago-Naperville-Elgin, IL-IN-WI MSA; the Dallas-Fort Worth-Arlington, TX MSA; the Houston-Pasadena-The Woodlands, TX MSA; the Las Vegas-Henderson-North Las Vegas, NV MSA; the Los Angeles-Long Beach-Anaheim, CA MSA; the Miami-Fort Lauderdale-West Palm Beach, FL MSA; the New Orleans-Metairie, LA

Defendants fixed prices through their use of revenue management software ("RMS") produced by IDeaS, demand forecasting software ("Demand360") produced by Amadeus Hospitality, and other means of communication, interactions, and signals to and with their co-conspirators. To effectuate the conspiracy, Operator Defendants agreed to provide IDeaS and Amedeus with a continuous stream of real-time and future, non-public, competitively sensitive price and occupancy information for virtually every transaction or attempted transaction. Operator Defendants did so knowing that their horizontal competitors were also sharing their competitively sensitive price and occupancy information in real time or near real time.

2.    IDeaS took this data and plugged it into its decision system, which includes a pricing algorithm and artificial intelligence ("AI"). IDeaS then used these tools to generate pricing and occupancy decisions[2] for Operator Defendants that they adopted automatically in virtually every instance. IDeaS also used the non-public data to generate a number of other metrics for Operator Defendants, including occupancy forecasts that were developed using Demand360 data.

3.    In fact, as detailed below, IDeaS makes clear that its RMS is specifically designed to make pricing *decisions* for Operator Defendants that are adopted automatically – not *recommendations* requiring further human intervention. As IDeaS explained, "[m]any revenue management systems provide recommendations that require a manual validation and/or deployment while IDeaS' advanced revenue management solutions produce automated decisions.." Indeed, IDeaS explicitly designed its RMS to "enable hotels to achieve optimal

---

MSA; the New York-Newark-Jersey City, NY-NJ MSA; the Orlando-Kissimmee-Sanford, FL MSA; the Phoenix-Mesa-Chandler, AZ MSA; the San Diego–Chula Vista–Carlsbad, CA MSA; the San Francisco–Oakland–Fremont, CA MSA; the Seattle-Tacoma-Bellevue, WA MSA; and the Washington-Arlington-Alexandria, DC-VA-MD-WV MSA.

[2] "Pricing decisions" refer to prices provided by IDeaS that Operator Defendants and co-conspirators implement in virtually every instance. "Occupancy decisions" refer to demand-based inventory controls performed by IDeaS, which include whether to release for sale certain rooms at certain prices.

revenue performance through automatically deployed controls that manage pricing, rate availability and overbooking." IDeaS also counseled clients to simply "trust" the pricing decisions because IDeaS had better data than any individual hotel operator.

4.      As IDeaS intended, Operator Defendants stopped making pricing decisions and outsourced them to a common third party – IDeaS – following adoption of the IDeaS RMS. According to a former IDeaS employee, whose responsibilities included answering questions from hotel operator-clients concerning pricing and occupancy decisions generated by IDeaS G3 RMS ("FE1"), Operator Defendants and their co-conspirators automatically adopted IDeaS' pricing decisions of the time 99% of the time.[3]

5.      Due to their collective use of IDeaS' pricing decisions and occupancy controls, Operator Defendants were able to significantly and continuously increase prices despite noticeably lower demand (compared to pre-Covid 19 occupancy rates). Operator Defendants could do this because they knew the other Operator Defendants and co-conspirators would not compete on price since they were also agreeing to the pricing decisions from IDeaS in virtually every instance. In fact, IDeaS highlighted in marketing materials that its controls like "pricing floors" would prevent price competition among users that would "risk overall profitability."[4]

6.      Antitrust enforcement officials have warned against this form of price-fixing for the last several years, cautioning that the day would soon arrive when competitors could effectuate a horizontal conspiracy by outsourcing their pricing decisions to a third-party algorithm with access to the competitors' data.[5] That day has come.

---

[3] The former employees of IDeaS identified herein each requested to remain anonymous due to well-founded fears of retribution by Defendants and other co-conspirators.
[4] https://ideas.com/what-is-dynamic-pricing/.
[5]  Maureen K. Ohlhausen, Should We Fear The Things That Go Beep In the Night? Some Initial thoughts on the Intersection of Antitrust law and Algorithmic Pricing, Federal Trade Commission (May                                          23,                                          2017),

7.    By sending their sensitive confidential pricing and occupancy information to a third party to process, analyze, and develop supra-competitive prices, the Operator Defendants are able to achieve the same result as if they secretly met in a back room and exchanged their information. This is an old-fashioned horizontal conspiracy between competitors that courts treat as *per se* illegal.

8.    To further develop and shape its conspiracy, IDeaS conducts user-only events, summits, and meetings with the co-conspirator hotel operators, which it represents are "…to showcase how IDeaS consolidates hotel data to deliver total profit optimization." [6] These events are nothing like trade association meeting used to achieve pro-competitive or pro-consumer outcomes; rather, they are gatherings of C-level executives from each Defendant that are used to reinforce the benefits and profitability of the conspiracy alleged herein.

9.    IDeaS and Amadeus have contracted with each other to integrate Demand360 into IDeaS RMS and have, thus, agreed to engage in the alleged conspiracy, as each has collected non-public, competitively sensitive data from Operator Defendants for the specific purpose of using it to generate supra-competitive pricing and occupancy decisions, occupancy controls, and occupancy forecasts for hotel operators.

10.    Operator Defendants agreed with IDeaS to engage in the alleged conspiracy, as each agreed to (and did) send its non-public data to IDeaS in exchange for supracompetitive pricing and occupancy decisions incorporating competitor non-public data. Operator Defendants also know which of their competitors use Demand360. Not only does Amadeus (Demand360's

---

https://www.ftc.gov/system/files/documents/public_statements/1220893/ohlhausen_-_concurrences_5-23-17.pdf; U.S. Dep't of Justice, Memorandum of Law in Support of the Statement of Interest of the United States, Nov. 15, 2023, In re: RealPage, Rental Software Antitrust Litigation (No. II), No. 3:23-MD-3071 (M.D. Tenn.), ECF No. 628.
[6] https://www.hospitalitynet.org/news/4111666.html#:~:text=insights%20and%20best,total%20profit%20optimization.

1   parent company) publicize its users, but also Operator Defendants are required to build

2   competitive sets on Demand360 from a list of competitors that also use Demand360.

3       11.     Operator Defendants have also agreed among themselves to artificially increase,

4   stabilize, or otherwise set hotel room rates. Supporting this position, Operator Defendants (i) send

5   non-public, competitively sensitive pricing and occupancy data to IDeaS and Demand360

6   knowing which of their competitors are doing the same and that such data will be used to calculate

7   pricing and occupancy decisions for competitors; (ii) adopt pricing and occupancy decisions from

8   IDeaS automatically in nearly every instance knowing the decisions include non-public

9   competitor data and that their competitors are doing the same; (iii) implement price floors

10  (referred to as "Last Room Value" by IDeaS) that prevent competition below a certain price

11  knowing their competitors will do the same and, therefore, will not lose market share; and (iv)

12  implemented complex and historically unprecedented parallel changes to pricing and occupancy

13  strategies, resulting in higher prices and lower occupancy. Several other factors support the

14  alleged horizontal agreements among Operator Defendants, including (i) the Operator Defendants

15  all had a very strong motive to conspire given that each lost roughly 50% of their revenue in 2020

16  due to the Covid-19 pandemic; (ii) the Operator Defendants all engaged in actions against their

17  interests but-for the existence of the conspiracy, including sending non-public, competitively

18  sensitive data to IDeaS knowing it would be used to help competitors price and setting price floors

19  well-above the marginal cost of renting an additional room even during periods of low demand;

20  and (iii) the hotel market is particularly susceptible to the type of collusion alleged herein given

21  the fungibility of hotel rooms (particularly at the rate code level), the relatively high concentration

22  in the hotel market, and the high barriers to entry in this market given it costs hundreds of millions

23  of dollars and takes several years to develop a new upscale hotel and obtain the necessary permits

24  and licenses to operate.

12.     Defendants' conspiracy has harmed competition and consumers. By agreeing to use a shared algorithm to set prices, Operator Defendants have replaced independent decision-making by marketplace competitors with cooperative price-fixing, thereby eliminating or severely impairing market competition. And, by artificially inflating hotel room rates to supra-competitive levels through their conspiracy, consumers have been harmed by paying higher prices for hotel rooms and losing important sources of competition.

## II.   PARTIES

13.     Plaintiff HANSON DAI is a citizen and resident of Illinois. Mr. Dai has rented hotel rooms at Defendants' properties in the Relevant Sub-markets of Seattle, Chicago, New Orleans, and Las Vegas during the Class Period. Mr. Dai paid higher prices for these room rentals because of the antitrust violations alleged herein.

14.     Plaintiff MAX CHISWICK is a citizen and resident of Illinois. Mr. Chiswick has rented hotel rooms at Defendants' properties in the Relevant Sub-markets of Los Angeles, Miami, San Francisco, and New York during the Class Period. Mr. Chiswick paid higher prices for these room rentals because of the antitrust violations alleged herein.

15.     Plaintiff ADOLPH ROBLES is a citizen and resident of Texas. Mr. Robles has rented hotel rooms at Defendants' properties in the Relevant Sub-market of Houston during the Class Period. Mr. Robles paid higher prices for these room rentals because of the antitrust violations alleged herein.

16.     Plaintiff STEVEN STACK is a citizen and resident of South Carolina. Mr. Stack has rented hotel rooms at Defendants' properties in the Relevant Sub-markets of New Orleans and New York during the Class Period. Mr. Stack paid higher prices for these room rentals because of the antitrust violations alleged herein.

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW

17.     Plaintiff MATTHEW GILBERT is a citizen and resident of South Carolina. Mr. Gilbert has rented hotel rooms at Defendants' properties in the Relevant Sub-markets of Los Angeles, and Orlando during the Class Period. Mr. Gilbert paid higher prices for these room rentals because of the antitrust violations alleged herein.

18.     Plaintiff MICHAEL MOLINARO is a citizen and resident of Illinois. Mr. Molinaro has rented a hotel room at Defendants' properties in the Relevant Sub-market of Chicago during the Class Period. Mr. Molinaro paid higher prices for these room rentals because of the antitrust violations alleged herein.

19.     Plaintiff TONY QIAN is a citizen and resident of New Jersey. Mr. Qian has rented hotel rooms at Defendants' properties in the Relevant Sub-markets of Washington D.C., Las Vegas, Miami, Los Angeles, San Francisco, Dallas, Seattle, and New York during the Class Period. Mr. Qian paid higher prices for these room rentals because of the antitrust violations alleged herein.

20.     Plaintiff MARK LESTER is a citizen and resident of Florida. Mr. Lester has rented hotel rooms at Defendants' properties in the Relevant Sub-markets of Chicago, Los Angeles, Boston, Miami, Atlanta, Baltimore, and Orlando during the Class Period. Mr. Lester paid higher prices for these room rentals because of the antitrust violations alleged herein.

21.     Plaintiff STEVEN SHATTUCK is a resident of Fort Collins, Colorado. Mr. Shattuck has rented hotel rooms in the Relevant Sub-market of San Diego during the Class Period. He paid supra-competitive prices for these room rentals as a result of the antitrust violations alleged here.

22.     Plaintiff JOEL KAMISHER is a resident of California. Mr. Kamisher has rented hotel rooms at Defendants' properties in the Relevant Sub-market of San Francisco. Mr. Kamisher paid higher prices for his room rental because of the antitrust violations alleged herein.

23.     Defendant IDEAS INC. is headquartered in Bloomington, Minnesota and incorporated in Delaware. IDeaS is a subsidiary of SAS. IDeaS is the dominant provider of revenue management and profit optimization software ("RMS") and services for hotel operators. Its software has been implemented at more than 30,000 properties worldwide, including by Operator Defendants in each of the Relevant Sub-markets.

24.     Defendant HILTON DOMESTIC OPERATING COMPANY INC. ("Hilton") is headquartered in McLean, Virginia, and incorporated in Delaware. During the Class Period, Hilton provided IDeaS with non-public, competitively sensitive, real-time pricing and occupancy data and received the same information from IDeaS regarding competitors, directly and/or as an input in pricing decisions from IDeaS.

25.     Defendant Hilton was one of the first hotel operators to adopt IDeaS' RMS. Following a pilot program in or about 2012, Defendant Hilton formally adopted IDeaS' G3 RMS in mid-2013. It has continued to use the G3 RMS since then.

26.     Defendant Hilton began using Demand360 in or about 2016. It entered an agreement to continue its partnership with Demand360/Amadeus in 2023.[7]

27.     Defendant WYNDHAM HOTELS & RESORTS, INC. ("Wyndham") is an American hotel company headquartered in Parsippany, New Jersey and incorporated in Delaware. It operates hundreds of properties in the US, including in each Relevant Sub-market. Throughout the Class Period, Defendant Wyndham provided IDeaS with non-public, competitively sensitive, real-time pricing and occupancy data and received the same information from IDeaS regarding competitors, directly and/or as an input in pricing decisions from IDeaS.

---

[7] https://amadeus.com/en/newsroom/press-releases/business-intelligence-partnership-extended-with-hilton.

28.      Defendant Wyndham began using IDeaS G3 RMS and its own IDeaS RMS ("RevIQ") in or about 2022. Some Wyndham hotels use RevIQ and some use the G3 RMS; however, RevIQ and G3 perform the same relevant functions, including providing price and occupancy decisions using the same algorithm and AI as the G3 RMS. RevIQ was created "in collaboration with IDeaS" and "is designed to deliver top-tier performance" by using "real-time data and analytics to make automatic pricing decisions and adjustments," i.e., to accomplish the same things as the G3 RMS. IDeaS lists Wyndham prominently as a G3 RMS user in its G3 RMS brochure via the following graphic:[8]



29.      Defendant Wyndham began using Demand360 in or about February 2022. [9]

30.      Defendant FOUR SEASONS HOTELS LIMITED ("Four Seasons") is a Canadian Limited Company headquartered in Toronto. There are more than 40 Four Seasons hotels in the US, including at least one in each of the Relevant Sub-markets. Throughout the Class Period, Defendant Four Seasons provided IDeaS with non-public, competitively sensitive, real-time pricing and occupancy data and received the same information from IDeaS regarding competitors, directly and/or as an input in pricing decisions from IDeaS.

---

[8]    https://ideasservices.wpenginepowered.com/wp-content/uploads/2020/06/IDeaS-G3-RMS-Brochure-EE.pdf.

[9]    https://amadeus.com/en/newsroom/press-releases/wyndham-teams-up-with-Amadeus-business-intelligence-insights.

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW

31.    Defendant Four Seasons has been using IDeaS' G3 RMS for more than a decade. [10]

32.    Defendant Four Seasons began using Demand360 soon after IDeaS partnered with Amedeus in 2016 and has been using Demand360 in conjunction with the G3 RMS since then.

33.    Defendant OMNI HOTELS MANAGEMENT CORPORATION ("Omni") is a hospitality company that is headquartered in Dallas, Texas. It is wholly owned by TRT Holdings, Inc. There are approximately 50 Omni hotels in the United States. Throughout the Class Period, Defendant Omni provided IDeaS with non-public, competitively sensitive, real-time pricing and occupancy data and received the same information from IDeaS regarding competitors, directly and/or as an input in pricing decisions from IDeaS.

34.    Defendant Omni has used IDeaS' RMS since at least March 2019. On March 21, 2019, IDeaS announced that "Omni Hotels and Resorts will roll out both IDeaS G3 Revenue Management System (RMS) and IDeaS Smart Space, a cloud-based meetings and events strategy application, across its portfolio of 60 distinct luxury hotels and resorts in North America."[11] Under the heading "Automated pricing decisions for over 21,000 guest rooms," the release discussed that "IDeaS G3 RMS" would empower "Omni's revenue managers."[12]

35.    Defendant Omni began using Demand360 soon after adopting IDeaS G3 RMS and has used it since then.

36.    Defendant HYATT CORPORATION ("Hyatt") is a multinational hospitality company headquartered in Chicago, Illinois and incorporated in Delaware. There are 791 Hyatt

---

[10] https://ideas.com/hotel-revenue-new-cco/; https://www.linkedin.com/in/claudia-vaccaro-1355238/?originalSubdomain=ca; https://www.linkedin.com/in/islam-gamal-abdelghani/?originalSubdomain=eg.
[11] https://ideas.com/news/omni-hotels-ideas-total-revenue/.
[12] *Id.*

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW

hotels in the United States as of November 20, 2023, including multiple hotels in each of the Relevant Sub-markets. Throughout the Class Period, Defendant Hyatt provided IDeaS with non-public, competitively sensitive, real-time pricing and occupancy data and received the same information from IDeaS regarding competitors, directly and/or as an input in pricing decisions from IDeaS.

37.     Hyatt began using IDeaS G3 RMS by August 2022 at the latest. In a press release, IDeaS unveiled its "global collaboration with Hyatt to power Hyatt's commercial revenue platform" in which "Hyatt will deploy IDeaS' suite of products globally as a key component in the evolution of its commercial stack."[13]

38.     Hyatt was a founding partner of Demand360 and its hotels have used it since its inception. Hyatt has integrated Demand360 into its G3 RMS since 2022.

39.     The acts alleged to have been done by Defendants were authorized, ordered, or performed by their directors, officers, managers, agents, employees, or representatives in the course of their employment and while actively engaged in the management of Defendants' affairs.

40.     Each Defendant, with respect to and through its subsidiaries, divisions, affiliates and agents, committed the acts alleged herein in concert, with each acting as the agent or joint-venturer of or for the others with respect to the acts, violations, and common course of conduct alleged herein, and under the authority and apparent authority of parent entities, principals and controlling parties.

41.     Various hotel operators not named as defendants in this Complaint participated as co-conspirators in the alleged conspiracy herein through their use of IDeaS' RMS and pricing algorithm and performed acts and made statements in furtherance thereof. These presently

---

[13] https://www.prnewswire.com/news-releases/ideas-announces-hyatt-will-deploy-ideas-platform-across-global-portfolio-301603948.html.

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW

unnamed co-conspirators include Accor S.A. ("Accor"), a multinational hospitality company with more than 40 hotels in the U.S. Defendants are jointly and severally liable for the acts of their co-conspirators whether or not named as defendants in this Complaint.

## III.    JURISDICTION AND VENUE

42.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, as this action arises out of Section 1 of the Sherman Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26).

43.    This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act (15 U.S.C. § 22), Federal Rule of Civil Procedure 4(h)(1)(A), and California's long-arm statute.

44.    Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, may be found in and transact business in the forum state, including the rental of hotel guest rooms.

45.    Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, engage in interstate commerce in the sale of hotel guest rooms.

46.    Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and the federal venue statute (28 U.S.C. § 1391), because one or more Defendants maintain business facilities, have agents, transact business, and are otherwise found within this District and certain unlawful acts alleged herein were performed and had effects within this District.

## IV.    CLASS ACTION ALLEGATIONS

47.    Plaintiffs bring this action on behalf of themselves, and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), seeking damages as well as equitable and injunctive relief for the following class:

All persons and entities in the United States and its territories who rented Operator Defendants' hotel guest rooms in the Relevant Sub-markets during the period of April 26, 2020, until the Defendants' unlawful conduct and its anticompetitive effects cease to persist (the "Rental Class").

48.     Plaintiffs also bring this action on behalf of themselves, and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2), seeking equitable and injunctive relief for the following class:

All persons and entities in the United States and its territories who rented Operator Defendants' or co-conspirators' hotel guest rooms in the United States during the period of April 26, 2020, until the Defendants' unlawful conduct and its anticompetitive effects cease to persist (the "National Class").

49.     <u>Exclusions</u>: Specifically excluded from the Classes are all persons and entities in the United States and its territories who rented extended stay rooms from the Operator Defendants' or their co-conspirators' during the class period. Also, specifically excluded from the Classes are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Further excluded from the Classes are any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action.

50.     <u>Class Identity</u>: The Classes are readily identifiable and for which records exist.

51.     <u>Numerosity</u>: Class Members are so numerous and geographically dispersed that joinder is impracticable. There are at least tens of thousands of members in the proposed Classes.

52.     <u>Typicality</u>: Plaintiffs' claims are typical of the claims of Class Members because Plaintiffs overpaid for hotel room rentals from Operator Defendants because of the conspiracy alleged herein.

53.     Defendants have acted in a manner that applies generally to Plaintiffs and all Class Members. Each Class Member has been similarly impacted by Defendants' unlawful conduct and concerted action alleged herein.

54.     <u>Commonality</u>: There are questions of law and fact common to the Classes, including, but not limited to:

    a.   Whether IDeaS used competitively sensitive, non-public information from competing hotels to generate pricing decisions and/or demand forecasts for competing hotels;

    b.   Whether Defendants have entered into a contract, combination, conspiracy, or common understanding to increase hotel room rental prices and/or suppress the supply of hotel rooms in the Relevant Sub-markets;

    c.   Whether Defendants' conduct artificially increased prices for hotel room rentals in the Relevant Sub-markets;

    d.   Whether Defendants' conduct violates Section 1 of the Sherman Act;

    e.   Whether Plaintiffs and Class Members were injured by Defendants' conduct; and

    f.   Whether Defendants conduct should be analyzed as a *per se* violation or under a quick look or rule of reason analysis.

55.     <u>Predominance</u>: The above-listed questions of law and fact are common to all Class Members and predominate over any questions that may affect Class Members individually.

56.     <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the Classes in that Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Classes and Plaintiffs have retained counsel competent and experienced in the prosecution of complex antitrust class actions to represent themselves and the Classes.

57.    <u>Superiority and Manageability</u>: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all Class Members is impracticable. The individual prosecution of separate actions by individuals would lead to repetitive adjudication of common questions of fact and law and create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants. There will be no difficulty in the management of this action as a class action.

## V.    FACTUAL BACKGROUND

### A.    Competitive Hotel Room Rental Markets

58.    In a competitive hotel room rental market, each hotel operator prices rooms independently based on its own analysis and data. Room rates are typically based on a variety of factors, including location, seasonality, and demand. Given the relative fungibility of hotel rooms, particularly when grouped by class, hotels generally compete on price by reducing room rates or offering other valuable concessions to guests.

59.    This competition disciplines prices and leads to lower prices and higher quality for consumers. In a functional, competitive market, if a hotel operator prices rooms above the competitive level, then its competitors' prices will be lower and consumers will most likely elect to stay at the competing properties. Therefore, absent collusion, a hotel operator would lose business if its room prices exceed the competitive level and eventually go out of business.

60.    Hotels are also incentivized to maximize occupancy in competitive markets. The marginal cost of renting an additional room is relatively low. On the other hand, the upfront costs associated with a hotel are significant (e.g., construction, licensing and other fixed costs). Therefore, in a competitive market, hotels will try to rent rooms as long as the price exceeds its relatively low marginal cost.

61.    Prior to the Covid-19 Pandemic and the effective implementation of the conspiracy, the competitive hotel industry produced relatively predictable and consistent occupancy rates and average daily rate ("ADR") movement. Operator Defendants had occupancy rates that were typically between 76% and 78% and increases or decreases in ADR of 2-3%. However, as demonstrated below, Defendants have subverted these competitive market dynamics by colluding on prices, leading to supra-competitive room rates. The Operator Defendants can price in this manner because they know their co-conspirator hotel operators will not compete on prices.

**B.    Impact of the Covid-19 Pandemic on the Hotel Industry and Pricing Strategies**

62.    The US hotel industry was hit exceptionally hard by the Covid-19 pandemic. Due to travel restrictions and related issues, the industry suffered a severe and unprecedented shock to demand and, therefore, occupancy and revenue. In 2020 alone, hotel industry revenue dropped by nearly 50%.

63.    Operator Defendants fully experienced these shocks. For Defendant Hilton, its system-wide RevPAR decreased 59.2 percent and 56.7 percent on a currency neutral basis for the fourth quarter and full year in 2020, respectively, compared to the same periods in 2019.[14] Likewise, Defendant Hyatt had net income decrease by nearly $1.5 billion ($766 million in 2019 to -$703 million in 2020) and system-wide RevPAR decreased by 65.4%.[15]

64.    Faced with unprecedented reductions in revenue and desperate to recoup losses, Operator Defendants looked for ways to increase revenue. They found it through their collective use of IDeaS RMS and Demand360 to artificially increase room prices through unlawful data

---

[14] https://stories.hilton.com/releases/hilton-reports-4th-quarter-2020-full-year-results.
[15] https://www.businesswire.com/news/home/20210217005859/en/Hyatt-Reports-Fourth-Quarter-2020-Results.

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW

sharing and price fixing. As discussed in detail below, to accomplish this, Operator Defendants agreed to send sensitive non-public data to Demand360 and IDeaS to enable IDeaS to pool, commingle, and use this non-public data from multiple competitors to generate pricing decisions that increase revenue.

65.     Amadeus, owner of Demand360, touted the benefits of using non-public forward-looking data following the pandemic, explaining that "[a]s consumer confidence fluctuates with states moving in and out of phased recovery, relying on data from last week or last year to drive a future revenue strategy will not be beneficial. Because of Covid-19, there is no time in history we can compare to what is happening in the industry now."

66.     Likewise, in a press release announcing the adoption of Demand360 by co-conspirator Accor in September 2020, Amadeus stated:

> As COVID-19 continues to disrupt travel around the globe, hoteliers face many challenges in running their business and planning for the future. The historical references and past data they once relied on to build their revenue strategies no longer aligns with current market trends, making it more critical than ever to have access to powerful business intelligence tools.

> To support Accor hoteliers in successfully navigating COVID-19 and to plan for the future, the hotel group has expanded its strategic partnership with Amadeus to include the use of Demand360®. ***The solution provides the most comprehensive, forward-looking market data in the hospitality industry. With more than 30,000 global data providers including hotels and alternative accommodations, hoteliers gain insight into one year of forward-looking occupancy data to help them improve decision making, maximize distribution strategies, and increase revenue per available room (RevPAR) as well as local market share***.[16]

67.     Again, in October 2020, Defendant Hilton extended its use of Demand360. According to the press release announcing the deal, "[w]ith this integration Demand360 data provides GRO's analytics with improved visibility . . .. The result seen by the Hilton properties

---

[16] https://amadeus.com/en/newsroom/press-releases/accor-amadeus-partnership-business-intelligence  (emphasis added).

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW

that recently completed the pilot integration is refined decision-making, enabling revenue improvement. . . . In challenging times for the hotel industry, having access to quality, forward-looking data is paramount."[17]

### C. Operator Defendants Adopt Unprecedented Changes to Pricing and Occupancy Strategies Following the Covid-19 Pandemic and After Adoption of IDeaS and Demand360.

68.    As described above, in a competitive hotel market, hotel operators would seek to maximize occupancy. To do so, they would generally lower prices to attract consumers.

69.    Following the Covid-19 pandemic and adoption of IDeaS RMS and Demand360, Operator Defendants engaged in complex, unprecedented, and parallel changes to pricing and occupancy strategies. During this time, Operator Defendants consistently and substantially increased room rental rates to their highest all-time level, surpassing pre-pandemic levels by 2022 or 2023. Operator Defendants were able to do this despite no corresponding increase in demand, as occupancy levels remained noticeably below pre-pandemic levels. These unprecedented, simultaneous parallel changes in prices by all Operator Defendants is consistent with a change in pricing strategy that reflects adoption and adherence to IDeaS' pricing decisions.

70.    Operator Defendants' change in pricing and demand strategy is demonstrated by the table below, which shows Defendant Hilton's ADR and occupancy rate in the US over the last decade. Prior to the conspiracy and the Covid-19 pandemic, Defendant Hilton had very steady occupancy rates and slight increases or decreases to ADR of 2-3% annually. However, following

---

[17] https://www.bing.com/search?q=Bertand+Cognard%2C+Hilton+and+Amadeus+renew+and+expand+exclusive+Business+Intelligence+partnership%2C+Amadeus+(Oct.+22%2C+2020)%2C+https%3A%2F%2Famadeus.com%2Fen%2Finsights%2Fpressrelease%2F+hilton-amadeus-renew-expand-exclusive-business-intelligence-partnership+(last+visited+Apr.+28%2C+2025).&cvid=c2e37d8d2faa46bab2cc1c30c59bf9ad&gs_lcrp=EgRlZGdlKgYIABBFGDkyBggAEEUYOTIICAEQ6QcY_FXSAQc3MzhqMGo5qAIIsAIB&FORM=ANAB01&adppc=EDGEESS&PC=HCTS.

the pandemic, Defendant Hilton has been able to increase room rates well above pre-Covid 19 levels despite occupancy rates that remain appreciably below pre-Covid 19 levels. Such pricing behavior indicates a significant shift in pricing and occupancy strategy by Defendant Hilton.

| DEFENDANT HILTON WORLDWIDE HOLDINGS INC. | | |
|---|---|---|
| YEAR | ADR | OCCUPANCY RATE |
| 2015 | $140.31 | 76.2% |
| 2016 | $143.75 | 75.9% |
| 2017 | $146.78 | 76.3% |
| 2018 | $149.09 | 76.3% |
| 2019 | $148.70 | 76.2% |
| 2020 | $117.40 | 42.2% |
| 2021 | $132.94 | 60.8% |
| 2022 | $157.77 | 69.9% |
| 2023 | $165.16 | 72.2% |
| 2024 | $167.27 | 72.5% |

71.     Defendant Hyatt has also noticed a significant disconnect between occupancy rates and ADR since it adopted IDeaS in 2022. Prior to the pandemic, Hyatt had consistent annual occupancy rates in the U.S. between 76% and 78%. Following the pandemic, Hyatt has not had occupancy rates above 70%. Despite this significant drop in demand, Hyatt's ADR was up 14% from pre-Covid 19 levels by the end of 2022.[18] And it has continued to increase every year despite no corresponding increase in demand.

72.     While ADR and occupancy rates are not publicly available for all Operator Defendants, the available data indicates that all Operator Defendants have concurrently

---

[18] https://www.businesstravelnews.com/Procurement/Hyatt-Q4-Group-Revenue-Fully-Recovers-Corp-Travel-Lags

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW

implemented the same change in pricing and occupancy strategy as Hilton and Hyatt – increasing prices significantly without a corresponding increase in demand or occupancy rates.

73.    The significant increases in room prices cannot be explained by an equivalent increase in operating costs. Demonstrating this fact, Defendant Hilton's company-wide gross profit for the five years preceding the pandemic (2015-2019) went up and down and averaged $6.73 billion. In the three years since the pandemic (2022-2024), Hilton's gross profit has only increased and has averaged $8.97 billion – a 33% increase. The same is true for its earnings per share. In the five years before, the pandemic, Hilton's EPS averaged $2.83. In the three years following the pandemic, Hilton's EPS averaged $5.00 – a 76% increase.

74.    Defendant Hyatt has experienced similar trends. In the five years before the pandemic, Hyatt's gross profit averaged $953.4 million. In the three years following the pandemic, its gross profit averaged $1.257 billion – a 31% increase. In the five years before, the pandemic, Hyatt's EPS averaged $3.87. In the three years following the pandemic, its EPS averaged $6.26 – a 61% increase.

75.    This change in pricing and occupancy strategy predicated on limited price competition is precisely what IDeaS is seeking to achieve. For example, IDeaS admits that its RMS and controls therein are designed to limit competition on price, particularly where low demand would lead to lower prices. As IDeaS concedes in its article titled "What is Dynamic Pricing:"

> Unchecked discounting and value perception: ***Without proper controls in place like pricing floors, demand-driven dynamic pricing could spark a "race to the bottom" with competitors*** through prices that may hurt the perception of your property's value or risk overall profitability.[19]

**D.    IDeaS Designs its RMS to Use Non-Public Data to Make Pricing Decisions for Competitors.**

---

[19] https://ideas.com/what-is-dynamic-pricing/   (emphasis added).

76.    IDeaS is the world's leading provider of RMS for hotel operators. Its flagship RMS, G3 RMS, is the hotel industry's leading revenue management system, analyzing over 100 million pricing and booking decisions for over 1.6 million hotel rooms daily.

77.    IDeaS RMS costs Operator Defendants millions of dollars per year. As confirmed by FE1, the base price for the G3 RMS is $3 per room per month. For example, Hilton has more than 800,000 hotel rooms in the US managed by the G3 RMS, meaning it pays more than $2.4 million per month (or nearly $30 million annually) for its G3 RMS.

78.    The sharing of current and future commercially sensitive data among competitors has long been recognized as a violation of the antitrust laws. The DOJ made this point in a recent "Statement of Interest" filed in the *In re Pork Antitrust Litigation*. Specifically, the DOJ explained that "contemporaneousness" is a "significant" factor that courts consider when evaluating whether information sharing among competitors harms competition, stating:

> The temporal nature of the data—*i.e.*, whether it reflects past, present, or planned future conditions—carries significant weight in courts' analysis of information exchanges as well. As courts [including the Supreme Court] have recognized, ***exchanges of recent or future information carry far greater potential for anticompetitive effects than historical data***. *Am. Column*, 257 U.S. at 398-99; *Container Corp.*, 393 U.S. at 336; *Todd*, 275 F.3d at 211-12. ***Knowledge of competitors' current or future prices and plans enables firms to converge rather than to pursue their "separate economic interests,"*** *Am. Needle*, 560 U.S. at 195. In *Container Corp.*, the [Supreme] Court noted that the exchange of current information stabilized prices because "***[k]nowledge of a competitor's price usually meant matching that price.***" 393 U.S. at 336-37. Information sharing is more likely to enable this sort of anticompetitive behavior ***where the parties are sharing current data (price, output, or other information) or planned future changes***. (*emphasis added*) .

79.    According to countless statements from IDeaS, many of which are reproduced below, IDeaS designed its RMS (and underlying algorithm and AI) to (i) use and learn from ***current and future*** non-public commercially sensitive data from competitors (including data from Demand360); (ii) generate pricing decisions for those competitors based on their non-public data;

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(iii) make real-time changes to the pricing and occupancy decisions based on the current and future non-public data shared by competitors; and (iii) increase the prices charged by those competitors as a result.

> **i.    IDeaS' RMS is Designed to Collect, Use, and Learn From the Non-Public, Competitively Sensitive Data Provided by Hotel Operators and Co-Conspirators.**

80.    IDeaS' RMS solutions, including the G3 RMS, are designed to "deliver[] scientific pricing and inventory control decisions [to hotel operators] at the room type and rate code level to drive optimal revenue performance across segments."[20] The RMS is explicitly designed to "automate[] pricing, restrictions, and overbooking decisions to maximize RevPAR [revenue per available room] and help[] [hotel operators] focus on what's important." [21]

81.    As discussed above and below, the pricing and occupancy decisions provided by IDeaS were not mere recommendations – they were decisions that hotel operators adopted an estimated 99% of the time. In the rare instances in which they were not adopted automatically, hotel operators still used them as a baseline from which to deviate.

82.    To use IDeaS' RMS, Operator Defendants and their co-conspirators are required to provide at least the following non-public data to IDeaS:

- Historical pricing data for every transaction, much of which is non-public (e.g., discounted bookings, group bookings, membership bookings, and extended stay bookings);

- Real-time and future non-public pricing data on every booking or attempted booking;

- Historical occupancy levels by property and room type, which is largely non-public data;

---

[20] https://ideasservices.wpenginepowered.com/wp-content/uploads/2020/06/IDeaS-G3-RMS-Brochure-EE.pdf.

[21] https://ideasservices.wpenginepowered.com/wp-content/uploads/2020/06/IDeaS-G3-RMS-Brochure-EE.pdf.

- Real-time and future occupancy levels by property and room type, which is non-public data;

- Historical data on bookings by customer type (e.g., group, retail, discount, and wholesale), which is non-public data.

- Real-time and future data on bookings by customer type, which is non-public data;

- Interactions with consumers that do not result in transactions (e.g., requests made for sold-out rooms), which is non-public data;

- Real-time changes to current and future prices across different platforms, much of which is non-public data;

- Real-time and forecasted revenue by property and room type, which is non-public data; and

- Dates of special events that could impact demand, which is largely non-public data.

83.    Notably, current and future demand data is used primarily to generate pricing decisions and occupancy controls. This includes data collected by Demand360 and sent to IDeaS. This data includes contemporaneous occupancy data, 12 months of forward-looking occupancy data (i.e. the number of rooms booked), ADR, and RevPAR, in real time. As confirmed by FE1, this contemporaneous and forward-looking data is not publicly available.

84.    IDeaS uses this data to generate pricing and occupancy decisions for Operator Defendants and their co-conspirators. Specifically, IDeaS inputs this data into its decision systems (which include its pricing algorithm and AI). Those systems "incorporate [the] comprehensive datasets . . . enabling it to create a more complete picture of unconstrained demand and market conditions, while considering a full range of key factors, such as special events, competitor pricing, days to arrival, and many more."[22] As IDeaS explains, it "folds all key data sources directly into optimization (competitor pricing, for example, is accounted for in optimization, as

---

[22] https://ideas.com/science-behind-g3-rms/.

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW

opposed to applying it simply as pricing rules after the RMS sets a price), optimizes all room types optimally, and avoids rules in doing so."[23]

85.     IDeaS incorporates all data into its decision systems to enable it to learn and improve from the non-public, competitively sensitive data shared by Operator Defendants. In a 2024 article in *Hospitality Net* titled "Wherever You Go," IDeaS Chief Evangelist and Chief Development Officer Klaus Kohlmayr explained that "Implementing G3 RMS in tens of thousands of properties, IDeaS "facilitates continuous improvement [of its algorithm and data science]. Human intervention is minimized, with the system autonomously selecting and models and parameters based on continuous learning.""[24]

86.     IDeaS' RMS also updates and optimizes price decisions on a continuous basis without intervention from hotel operators. As soon as the software detects a change in market conditions (which is often triggered by its analysis of non-public data shared by users), the RMS immediately and automatically updates its decisions to reflect the change. Describing this process, IDeaS explains its RMS is "technology that produces insights without prompting and makes necessary price changes without you watching over it . . . ." [25]

87.     As explained by FE1, IDeaS updates its pricing decisions by automatically weighing the true influence of competitors' pricing, future demand data such as TravelClick Demand360 and more.

88.     When discussing the "Science Behind G3," IDeaS explains that it incorporates the data into its systems in real time, which allows its decision systems to "always work[] to improve upon itself, regularly recalibrating and adjusting, without human intervention."[26]

---

[23] *Id.*
[24] https://www.hospitalitynet.org/opinion/4121599.html.
[25] https://ideas.com/switching-rms-4-myths/ https://ideas.com/switching-rms-4-myths/.
[26] *Id.*

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW

89.     As part of its decision system, IDeaS' RMS uses an algorithm to calculate pricing decisions. IDeaS uses the same algorithm to calculate pricing decisions for all Operator Defendants and co-conspirators. While the application of the algorithm differs slightly for each hotel given their unique characteristics; it is the same algorithm (i.e., brain) being used to calculate the pricing decisions. IDeaS' pricing algorithm continues to learn and improve over time as it receives non-public data from hotel operators. As it continues to learn and improve, the algorithm becomes increasingly effective at pricing supracompetitively, increasing revenue for hotel operators as a result.

90.     IDeaS has admitted to using non-public competitor data to train and fine-tune its AI and pricing algorithm, which invariably means such information is used to generate the pricing and occupancy decisions for Operator Defendants derived therefrom. For example, in a September 16, 2021, Hospitality Net video titled "HITEC TV: It's Not Your Old Revenue Management System Anymore," Kohlmayr explained that IDeaS was:

> [F]ocused on leveraging the data we had from our 16,000 hotels around the world to understand what's going on and teach the system what's going on. Right now, over the last 18 months, every two weeks, we go in and look at all the data we collect from millions and millions of datapoints around the world, and we finetune the algorithms and the science that goes into the pricing decisions.[27]

91.     Kohlmayr echoed these facts in a April 24, 2024 *Hospitality Net* article titled "Wherever You Go, There is Artificial Intelligence," explaining:

> Calibrating the system to the unique nuances of the hospitality sector, G3 RMS incorporates comprehensive datasets, considering factors like special events, competitor pricing, days to arrival, and more.

> Implementing G3 RMS in tens of thousands of properties facilitates continuous improvement. Human involvement is minimized, with the system autonomously selecting models and parameters based on continuous learning.[28]

---

[27] *Id.*
[28] https://www.hospitalitynet.org/opinion/4121599.html.

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW

92.     By receiving and utilizing real-time and future data, IDeaS can provide pricing and occupancy decisions for Operator Defendants that immediately take this data into account. According to an IDeaS business partner, "IDeaS has an insane ability to quickly respond to changes in a dynamic market. There's no one human that can physically do what this product can do—there's so much that goes into the algorithm. Revenue managers should simply believe in the tool, have faith in it, and they will achieve results that exceed their expectations." [29]

93.     Likewise, by receiving non-public occupancy data, IDeaS can employ a "demand-based" approach to calculating pricing and occupancy decisions for Operator Defendants, which invariably means IDeaS uses non-public competitively sensitive demand and occupancy data to calculate those decisions. In an article titled "Lessons in Revenue: Moderns Pricing Strategies," IDeaS explains that it applies "a truly dynamic, demand-based approach to pricing." Likewise, in its e-book titled "Lessons in Revenue: Breaking with Rules with Demand-based Dynamic Pricing," IDeaS explains that it uses a "demand-based pricing approach" to ensure hotels are achieving "the most profitable business mix." [30] Once again, in an article titled "What is Dynamic Pricing? What Hospitality Pros Should Know," IDeaS repeatedly states that it uses demand-based dynamic pricing to generate pricing and occupancy decisions. [31]

94.     According to FE1, IDeaS balances occupancy rates and market prices to maximize profits for clients when setting pricing decisions, and will alter the strategy based on market need, i.e., demand. Knowing the number of rooms available in real time in a market is a key piece of information that IDeaS has and can use to price more advantageously.

---

[29]
https://ideas.com/about/partners/#:~:text=%E2%80%9CIDeaS%20has%20an%20insane%20ability%20to%20quickly%20respond,they%20will%20achieve%20results%20that%20exceed%20their%20expectations.%E2%80%9D
[30] https://ideas.com/lessons-in-revenue-demand-based-dynamic-pricing/.
[31] https://ideas.com/what-is-dynamic-pricing/.

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW

95.     As discussed herein, occupancy data is not publicly available. This fact was confirmed by FE1. But IDeaS collects this information from every client for every transaction (including through Demand360), giving IDeaS an unparalleled view of demand in the hotel market. Therefore, IDeaS can only engage in its demand-based dynamic pricing by using and commingling the non-public data shared by Operator Defendants and their co-conspirators.

96.     IDeaS uses its unparalleled view of the hotel markets to generate supracompetitive pricing. As explained by FE1, clients would often call complaining that their prices were substantially higher than publicly viewable prices of competitors. In that situation, IDeaS would tell the client to keep their price as-is because that it does not have the "real data." Rather, IDeaS has the real data and it is more reliable, and pricing based on that data will lead to higher profits.

97.     As both the FTC and DOJ have recognized, algorithms can be used to fix prices more easily and effectively than traditional methods because of their capacity to process huge quantities of information far more quickly than a human analyst. They can also minimize the incentive for cartel members to cheat, i.e., deviate from the fixed price, because the algorithms not only enhance the ability to optimize cartel gains but also can monitor real-time deviations from cartel pricing to quickly identify non-conforming cartel members. [32]

### ii.     IDeaS' RMS is Designed for Hotel Operators to Outsource Automated Pricing and Occupancy Decisions to IDeaS.

98.     IDeaS specifically designs its RMS to make pricing and occupancy decisions (not recommendations) for hotel operators and to remove human intervention to the largest extent possible. According to FE1 and a former IDeaS manager who worked daily with hotel operator-clients ("FE2"), this automation of pricing for hotel operators, which led to a reduction in labor

---

[32] *See, e.g.*, Salil K. Mehra, *Price Discrimination-Driven Algorithmic Collusion: Platforms for Durable Cartels*, 26 Stan. J. L. & Bus. Fin. 171, 177 (2021).

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW

needed to set prices, is a primary reason hotel operators purchased IDeaS RMS. And, because IDeaS costs large hotel operators (like Operator Defendants) hundreds of thousands or millions of dollars per month, they would not continue to implement IDeaS RMS without implementing the pricing decisions.

99.     According to FE1, hotel operators adopted IDeaS' pricing decisions "99%" of the time. According to FE2, IDeaS' pricing decisions submitted to hotel operators were automatically implemented by the hotel operators with "no approval process," meaning hotel operators (including Operator Defendants) outsourced their pricing decisions entirely to IDeaS for these transactions.

100.    IDeaS has repeatedly and consistently highlighted the fact its RMS *automates* pricing and occupancy *decisions* for Operator Defendants, providing them with real-time supra-competitive pricing. This differs from providing *recommendations* that would require additional input from hotel operators prior to adoption.

101.    IDeaS explained the difference between decisions and recommendations as follows in an article titled *Decisions vs. Recommendations: It's all in the Name*:

> Many revenue management systems provide *recommendations* that require a manual validation and/or deployment while IDeaS' advanced revenue management solutions produce automated ***decisions.*** …
>
> ***Unlike decisions, which are system controls that are continually optimized and automatically deployed to integrated selling systems, recommendations have to be manually implemented into integrated selling systems.*** This means users are still responsible for reviewing, approving and uploading every recommendation the revenue management system produces. This not only impacts the amount of time and resources spent validating and uploading decisions but also forces users to be less nimble – having less time to course correct when there are sudden shifts in the market. . . .
>
> Underneath the surface and behind its sleek user interface, IDeaS' cloud-based solutions continually produce powerful decisions that enable hotels to achieve optimal revenue performance through ***automatically deployed controls that***

*manage pricing, rate availability and overbooking*. These decisions are based on a sophisticated analytical understanding of how a hotel's business behaves. [33]

102.    IDeaS and its executives have repeatedly and consistently echoed this sentiment, explaining that its RMS is designed to provide automated decisions. For example, when discussing the "revenue science behind the G3 RMS," IDeaS Chief Evangelist and Chief Development Officer Klaus Kohlmayr stated:

> The proven success of G3 RMS hinges on its ability to adapt to real-world business complexities *without requiring manual intervention*. The development teams at IDeaS created a system that could not only withstand the intricacies of the hospitality business but also deliver statistically proven results. *Their mission was clear: to achieve complete automation*, eliminate user error, and create a framework where the RMS could dynamically respond to changing conditions. [34]

103.    Likewise, in its G3 RMS brochure, IDeaS made the following statements:

- Welcome to the world's most advanced revenue management system, powered by revenue science, advanced analytics and machine learning. Get ready to embrace the full benefits of automation, with accuracy you can count on and decisions you can take to the bank.

- IDeaS G3 RMS transforms the right data into clear and actionable insights so you can: Fully automate distribution and revenue management tasks allowing you to focus on expectations, critical dates, and more.
- IDeaS G3 Revenue Management System (G3 RMS) delivers scientific pricing and inventory control decisions at the room type and rate code level to drive optimal revenue performance across segments. Powered by SAS High Performance Analytics, G3 RMS *automates pricing, restrictions and overbooking decisions* to maximize RevPAR and help you focus on what's important:

  Increase RevPAR

  Utilize accurate forecasts and distribute optimal pricing and revenue management decisions into all selling systems

  Enhance Productivity

- Data science and machine learning technology *automates granular data analysis, forecasting, pricing and controls* to allow you to focus on strategy

---

[33] https://ideas.com/decisions-vs-recommendations-name/ (emphasis added).
[34] https://www.hospitalitynet.org/opinion/4121599.html (emphasis added).

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW

- 100M+ pricing and overbooking decisions made daily

- Automation: Continually learns and adapts to how pricing and controls impact booking patterns and demand to improve outputs. **Decisions are seamlessly distributed to key technology systems**.

- Why settle for rules-based, pricing-recommendation tools? G3 Revenue Management Solution (G3 RMS) is a system that delivers scientific pricing decisions at the room type and rate code level to drive optimal revenue performance . . ..

- G3 RMS *automates pricing, restrictions and overbooking decisions* to maximize RevPAR and help you focus on what's important.

- Our sophisticated yet simple-to-use hotel revenue management system . . . leverages advanced data analytics for *automated decision-making*. [35]

104.    Again, in its 'Buyers Guide to Hospitality Revenue Management Solutions,' IDeaS explains: "Revenue management solutions can help [hotel operators] by providing dependable—and automated—pricing decisions . . . ." [36]

105.    During a hotel industry podcast titled *No Vacancy*, Sanjay Nagalia, Co-founder and CEO of IDeaS, stated that IDeaS' "solutions are all aimed at increasing [hotel operators'] revenue . . . *in a totally automated manner*."[37] During the same podcast, Mike Chuma, VP of Global Marketing for IDeaS, made the following observation about IDeaS' RMS:

> Most importantly, how quickly your system can help you make that decision [to close off certain rates] or make that decision for you, which is *a major difference between other revenue management systems and ourselves is that we do that through automation*, through artificial intelligence and machine learning, so we can make that decision quicker . . ..[38]

---

[35] https://ideas.com/wp-content/uploads/2020/06/IDeaS-G3-RMS-Brochure-EE.pdf (emphasis added).

[36] https://ideas.com/tools-resources/hospitality-revenue-management-buyers-guide/

[37] NO VACANCY LIVE!, Bright Ideas, Dim Hosts (Apple Podcasts, Aug. 8, 2021). https://podcasts.apple.com/us/podcast/fna-23-bright-ideas-dim-hosts/id1120881540?i=1000531381805.

[38] *Id.*

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW

106.   In a post on its website titled "Meet IDeaS New Chief Evangelist," IDeaS introduced Kohlmayr through a question-and-answer format facilitated by IDeaS Senior Director of Marketing Elizabeth Walsh. In response to a question on the role that revenue management has in the hospitality industry, Kohlmayr stated:

> First of all, whoever has the most relevant data, combined with the most advanced analytics, will win. . . . [P]ricing will be automated, instant and in real time. Gone will be the days where hotel revenue managers will be able to validate and confirm pricing decisions before they are sent to the channel managers. *The systems will be making their pricing decisions and someone (not at the property level) will validate the decisions after the fact.*. . . . Properties will not be able to hire the resources with the capabilities to understand or use these systems so they will also be located centrally. As a result, pricing and demand optimization will become more centralized, sophisticated and automated.

107.   In an article discussing the "Science Behind G3 RMS," IDeaS explained that "*[f]ull automation* eliminates the possibility for user error, creates a framework where our RMS can react as conditions change, and limits the need for human resource consumption." [39] It further explained that its RMS was able to "improve upon itself . . . without human intervention" and that its "groundbreaking artificial intelligence" allowed it to "autocorrect, individually, as needed and continuously learn about the property" without human intervention so that users had "more time back in their day." [40]

108.   Third parties recognize that IDeaS is designed specifically to provide decisions that are automatically input without human intervention. HotelMinder, a consulting firm with "extensive experience in hospitality management" focused on "bring[ing] next-gen operational technology" to independent hotels and connecting these clients "with top industry experts and cutting-edge technology," explained IDeaS as follows:

> Combining industry knowledge with innovative, data-analytics technology, IDeaS creates sophisticated yet simple ways to empower revenue leaders with precise,

---

[39] https://ideas.com/science-behind-g3-rms/
[40] *Id.*

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW

automated decisions they can trust. **IDeaS is not a recommendation System but a decision System, influenced by demand, competitors, volatility & uncertainty of market segments: it doesn't need human interaction to make a decision.**[41]

109.    Consistent with its intent for its RMS to fully automate pricing and occupancy decisions and keep client intervention to a minimum, IDeaS keeps its data analysis "under the hood" (i.e., secret) and encourages hotel operators to simply trust IDeaS' decisions and implement them automatically. IDeaS' Kohlmayr explained in an August 2024 article titled "Rigorous Revenue Management: AI Tech Tools Take Pricing and Forecasting Accuracy to the Next Level" that IDeaS believes mere displays of external data in an RMS for use by hotel operators introduces "noise into the equation" and that the G3 RMS is designed to "keep that noisy, up-for-interpretation data analysis under the hood, so to speak," meaning it is performed by IDeaS rather than providing hotel operators with the data and tools to make the decisions themselves.

110.    IDeaS also uses a "manage by exception" approach. [42] Under this approach, IDeaS generates pricing and occupancy decisions for Operator Defendants that they implement automatically unless there is the rare "exception." Only then will Operator Defendants intervene. However, even in these situations, Operator Defendants use the supra-competitive pricing decision from IDeaS as the starting point and make changes from that initial decision. As numerous courts and the DOJ have recognized, using supra-competitive prices as a starting point is *per se* unlawful even if the prices ultimately charged deviate from that starting point because this practice artificially increases prices for consumers and removes competition from the market.

111.    FE1 verified that IDeaS employs a "manage by exception" approach. A former IDeaS employee who worked in a senior management position relating to IDeaS RMS ("FE3") explained that the "default" for hotel operators is to "auto-implement[]" pricing and occupancy

---

[41] https://www.hotelminder.com/partner=IDeaS  (emphasis added).
[42] https://ideas.com/decisions-vs-recommendations-name/.

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW

decisions from IDeaS. For these decisions to not be automatically adopted, hotel operators must manually override the decisions.

112.    IDeaS also disciplines users to not deviate from its pricing and occupancy decisions. According to FE2, she was "always told" to tell clients to try as hard as possible not to override the pricing decisions.

113.    IDeaS provides testimonials on its website that further counsel against overriding pricing decisions from IDeaS. For example, according to Alise Deeb, Chief Revenue Officer of Dragonfly – a firm specializing in maximizing revenue for hotels, "[i]f you trust the system, you will sell rooms when you didn't think you were going to and you're going to sell them for rates you never thought you could get." [43] Likewise, Troy Pade, General Manager of the Sunset Tower Hotel, explained: "IDeaS G3 RMS has given us the confidence to be bold and ask for rates we previously had been afraid to publish," and that "[t]he rates IDeaS pushed out during this past awards season were almost double what we would have previously issued." [44]

114.    IDeaS further pressures users to adopt its pricing and occupancy decisions through account representatives that constantly audit users' pricing in the RMS. Hotel operators interact with these account representatives on a daily basis.

115.    IDeaS has also specifically constructed its RMS to disincentivize overriding its pricing decisions. According to an industry-recognized revenue management consultant, IDeaS designed G3 RMS to ensure that "every action in G3 causes a ripple effect on everything else" so, as a result, "users are less inclined to manually override system generated [pricing]." [45]

---

[43] https://ideas.com/success-story/maximizing-revenue-management-efficiency-through-partnership-with-ideas/.
[44] https://ideas.com/success-story/sunset-tower-hotel/.
[45] https://www.g2.com/products/ideas-g3-rms/reviews.

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW

116.    IDeaS also disincentivizes deviations by tracking and alerting users to manual overrides of pricing decisions that fall below certain thresholds, i.e., that undercut competitors and, therefore, the price fixing scheme. When a user overrides a pricing decision,  IDeaS catalogs this and creates an "Exception" tab that allocates an exception score to the pricing decision and gives the user ways to "action the Exception." This includes the option of "Suspend[ing] the exception on this date."

117.    Industry observers know that outsourcing pricing to IDeaS is central to its RMS. Hotel Tech Report explained "[a]utomation is at the core of the IDeaS approach to revenue management. . . . The best part of [its pricing model] is that it all happens in real time and in the background, so revenue managers can focus on tactics and strategy rather than manual data entry."[46]

118.    Finally, a former employee from Operator Defendant Wyndham confirmed that it outsources pricing and occupancy decisions to IDeaS. Specifically, the former employee explained that what he "love[s] about" IDeaS RMS is that "it allows me to put my hotel's revenue management strategy on autopilot, freeing my time to focus on other parts of the business while helping ensure I'm always getting the best possible return on every available room."

### iii.    IDeaS Generates Pricing and Occupancy Decisions for Operator Defendants Based on Competitors' Non-Public, Competitively Sensitive Data.

119.    IDeaS collects numerous pieces of non-public data from Operator Defendants. It then plugs this data into its algorithm and AI and uses it to make pricing and occupancy decisions that produce unparalleled increases in revenue for Operator Defendants. According to FE1, IDeaS needed to use the non-public data to do this because publicly available data was not

---

[46] https://hoteltechreport.com/news/6-powerful-ideas-g3-rms-features%20

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW

qualitatively good enough or reliable enough.

120.    As shown above, to generate its pricing and occupancy decisions, IDeaS collects Operator Defendants' and their co-conspirators' non-public, competitively sensitive, real-time transaction-level data for every booking or attempted booking (e.g., a request to book a sold-out room). IDeaS cannot obtain comparable real-time data from any other source, particularly as it relates to occupancy levels and rates charged for non-public sales (e.g., discount rates and group bookings).

121.    While some general hotel pricing information is public, much of the information sent to IDeaS by hotel operators (either directly or through the Demand360 integration) is non-public. This includes contemporaneous and future occupancy rates, information on attempted booking (e.g., attempted bookings for sold-out rooms), bookings by customer type (e.g., group, retail, discount, wholesale, etc.), contemporaneous and forecasted revenue by property and room type, and dates of special events at the property and room-type level that will influence demand.

122.    IDeaS uses this non-public information to gain clearer insights into its users' businesses and the hotel room rental market as a whole. This, in turn, enables IDeaS to make pricing decisions that increase users' revenue by 8-15%, with some users reporting growth of nearly 40% compared to pre-pandemic levels. [47]

123.    IDeaS prominently publicizes the fact it uses non-public data it receives from its users to generate its pricing and occupancy decisions. For example, Stephen Hambleton, Director, Product Management and Solution Success for IDeaS, stated:

> IDeaS' proven approach folds ***all key data sources directly into optimization (competitor pricing, for example is accounted for in optimization, as opposed to applying it simply as pricing rules after the RMS sets a price),*** optimizes all room types optimally, and avoids rules in doing so. IDeaS favors an accurate dynamic

---

[47] https://ideas.com/success-story/salamander-hotels-resorts-sees-record-portfolio-performance-with-ideas/.

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW

programming-based optimization, as opposed to simpler deterministic approaches that assume the demand forecast and other calibrations and assumptions are perfect. [48]

124.    Likewise, IDeaS includes the following statements in its G3 RMS brochure:

G3 RMS leverages superior analytics to determine the optimal price for all key products by room type, (e.g., Best Flexible Rate and Advance Purchase). This approach considers ***the demand profile of the product, competitors' influence and their impact on other products.***

MARKET DEMAND: ***Automatically weights the true influence of competitors' pricing, future demand*** and data such as TravelClick Demand360 and more on hotels' pricing to produce the most accurate forecast. [49]

125.    In a video on its website titled "How G3 RMS Determines Pricing," IDeaS explains that its pricing decisions are generated using "competitors' prices," the "impact future prices have on . . . demand," and "pricing decisions [designed to] optimize that demand." The following screenshots were taken from the video:

---

[48] https://ideas.com/science-behind-g3-rms (emphasis added)..
[49] https://ideasservices.wpenginepowered.com/wp-content/uploads/2020/06/IDeaS-G3-RMS-Brochure-EE.pdf (emphasis added).

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW












126.    As IDeaS explains in an article discussing its real-time rate optimization, IDeaS *"incorporates competitive and market data (rates, demand, reputation) directly into optimization, to ensure the RMS' controls remain optimal and adapt to market and target property changes.* These data sources are utilized optimally, rather than relying on user rules to determine how to react to changes in business conditions, which is often the case in many solutions on the market."[50] Again, the "market data," including "rates" and "demand," is based on non-public, competitively sensitive data, including occupancy rates and non-public sales.

127.    In an article titled "Lessons in Revenue: Modern Pricing Strategies," IDeaS notes that "[o]nly a best-of-class RMS platform enables a truly dynamic, demand-based approach to pricing" by "offering features" that include "[d]ynamic competitive benchmarking, drawing from a broad array of competitors, channels, and pricing data to make rate decisions."

---

[50] https://ideas.com/true-optimization/ (emphasis added).

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW

128.    Again, in an article titled "Lessons in Revenue: Dynamic Demand Forecasting," IDeaS explains that it relies on non-public competitor data to generate pricing decisions:

> Although a competitor's retail price is used most frequently, there are other sources such as forward-looking segment performance by Amadeus's Demand360 or even past performance benchmarking by STR. While competitive benchmarking data provided by STR reports may not be well suited for forecast models, displaying such data within the RMS can be a helpful pricing reference tool. Forward-looking market data [like that from Demand360], on the other hand, can help improve a forecast's robustness as it accounts for market-wide compressions or decompressions.[51]

129.    IDeaS has admitted to using non-public data when implementing an RMS for new hotels with no historical data. As IDeaS explained, it uses its "Limited Data Build" feature to generate price decisions by "clon[ing] data from existing hotels with similar business mixes to provide baselines *for demand and predicted guest behavior*."[52] Stated differently, IDeaS uses its non-public booking and occupancy data provided by users to generate pricing decisions and demand forecasts for new hotels.

130.    Multiple former IDeaS employees confirmed IDeaS used competitor non-public data to generate pricing decisions.

131.    IDeaS also uses the non-public data collected by Demand360 to generate pricing and occupancy decisions and forecasts for Operator Defendants. On September 28, 2016, IDeaS issued a press release to announce that it had agreed to combine TravelClick's Demand360 market intelligence product with its RMS to "help hotels optimize pricing and generate additional revenue."[53]

132.    Likewise, in its G3 brochure, IDeaS makes the following statement about the pricing and occupancy decisions it produces: "Market Demand: Automatically weights the true

---

[51] Unlike Ideas and Demand 360, STR relies on historical and anonymized data.
[52] https://hoteltechreport.com/news/6-powerful-ideas-g3-rms-features%20 (emphasis added).
[53] https://ideas.com/news/ideas-and-travelclick-announce-research-development-partnership/.

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

influence of competitors' pricing, ***future demand data such as TravelClick Demand360 and more on hotels' pricing to produce the most accurate forecast***." [54] Again, in a data sheet created by IDeaS, it explains that G3 "ensures that historical data, competitor rates, reputation scores and relevant market data, such as TravelClick Demand360, influence pricing decisions."[55]

133.    Likewise, in a statement from IDeaS COO Sanjay Nagalia, IDeaS explained that G3 "automatically implements and capitalizes on" the "revenue opportunities" provided by the Demand360 data. Nagalia continued by explaining that IDeaS' research "demonstrated that the insertion of demand intelligence data notably improved the demand forecast and uplift for hotels."

134.    IDeaS also uses non-public information to establish pricing floors that entirely prevent price competition among competitors below a certain rate. Specifically, IDeaS uses a metric called "Last Room Value" as a pricing floor. LRV is defined as "[t]he maximum amount of room revenue a hotel can expect to make from the last room available for sale. The system uses LRV as a restriction control for low value rates during busy periods and opens all rates during slow times."[56] According to FE1, IDeaS will not make pricing decisions below the LRV and that LRV functions as a target to make sure prices are not set too low. Stated differently, IDeaS uses its unparalleled view of market conditions obtained from numerous competitors' non-public data to set pricing floors that prevent competition in those markets below certain values. This has the exact same effect as competitors sharing non-public, competitively sensitive data directly with each other and agreeing to set a pricing floor.

---

[54] https://ideas.com/wp-content/uploads/2020/06/IDeaS-G3-RMS-Brochure-EE.pdf (emphasis added).
[55] https://cdn.mediavalet.com/usil/ideas/wSboT9rqSkOphykRHBf72A/2LCzASWZZk2KNL8pTwNNPg/Original/IDeaS%20G3%20RMS%20Datasheet%20UK.pdf.
[56] https://ideas.com/tools-resources/hotel-glossary-terms/#letter_L.

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW

135.    Third parties know that IDeaS uses non-public competitor data to produce its pricing and occupancy decisions. For example, GetApp, a platform that educates about software, explained that a "key benefit[] of the IDeaS G3 Revenue Management System" is that it "[a]ccurately forecasts demand using advanced analytics that incorporate hotel, market, and competitor data." Likewise, Capterra, a marketing platform, explained that IDeaS' RMS is "powered with forward market data and a hotel's own data."

136.    Also, according to Hotel Tech Report:

> Through artificial intelligence and machine learning, [IDeaS' RMS] makes precise revenue management decisions that most revenue managers would never be able to see. Ideal Pricing uses deep market intelligence, such as search penetration, competitor rates, booking trends, and reputation scores, to intelligently forecast demand and power a continuous pricing model. [57]

137.    Hotel Tech Report also provided the following diagram that identifies the inputs used by IDeaS' RMS to generate pricing decisions, including competitor data:



    iv.    **IDeaS Also Uses and Shares Non-Public Competitively Sensitive Data through Its Integration with Demand360.**

---

[57] https://hoteltechreport.com/news/6-powerful-ideas-g3-rms-features%20

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW

138.    In addition to using IDeaS, every Operator Defendant (and all or virtually all co-conspirators) utilize Demand360. According to Defendant Four Seasons, Demand360 was "the logical next step in the evolution of advanced revenue management. Incorporating future demand and market penetration data is essential to building a superior revenue strategy. . . . The more informed the demand model is, the better the optimization of pricing and inventory for hotels."

139.    IDeaS has partnered with Demand360 since at least 2016. In doing so, IDeaS has integrated Demand360 into its RMS and also used the data collected by Demand 360 (which includes non-public data like 12-months of future occupancy data) to generate pricing and occupancy decisions.

140.    Demand360 is a product by which Operator Defendants provide non-public present and future data concerning occupancy, ADR (average daily rate), and RevPAR (revenue per available room) data in exchange for the same information about a set of competitors selected by the Operator Defendants.

141.    Specifically, Demand360 users are required to provide 12 months of forward-looking occupancy data (i.e. the number of rooms booked), ADR, and RevPAR, in real time. With this information, users know both what their competitors are charging *and* how many rooms they are selling at that price.

142.    Through this exchange of non-public data, Demand360 gives hoteliers a comprehensive picture of hotel demand over time so they can better optimize revenue management, distribution and marketing strategies. According to its brochure, Demand360 "provides the complete picture [hotel operators] need, with detailed demand data for the past, present, and future."[58] It allows users to "[v]iew forward-looking occupancy by property and

---

[58] https://www.amadeus-hospitality.com/wp-content/uploads/sites/2/Demand360.pdf.

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW

across your competitive set, including business on the books this year versus same time last year"
and gives users a "unique insight into [their] forward-looking ADR and RevPAR rank compared
to your competitive set."[59]

143.    According to FE1, Demand360 provided clients with forward-looking data to try
to "predict into the future," which is why hotel operators wanted to integrate the product into their
IDeaS RMS.

144.    Again, this occupancy information is not publicly available, particularly as it
relates to current and future data. Current and future occupancy data is only known by the hotel
operator itself and cannot be gleaned from publicly available information. Current and future
ADR is based on the actual sale price, which is comprised of several pieces of non-public
information like discounted rates and group rates. Current and future RevPAR is based on both
the actual rates paid (not entirely public) and the number of available rooms at that time (not
public).

145.    Demand360 is a "give-to-get" system, meaning Operator Defendants can only get
non-public data about competitors if they provide the same information about itself. Specifically,
participating hotel operators must share twelve months of future occupancy and pricing data to
access the same data from competitors.[60] Operator Defendants would not provide this non-public
data to Amadeus (owner of Demand360 software), which they know is shared with competitors,
without knowing they will receive the same information from their competitors.

146.    Demand360 provides several features that utilize the non-public competitor data.
For example, Demand360 allows Operator Defendants to see where they rank on forward-looking
ADR and RevPAR (30-day and 90-day measurements available) compared to a competitive set

---

[59] *Id.*
[60] https://www.amadeus-hospitality.com/wp-content/uploads/sites/2/Demand360.pdf.

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW

that Operator Defendants select. This allows them to see how their future hotel room pricing and room revenue compare to their closest competitors based on non-public information.

147.    The non-public data collected by Demand360 (and subsequently used by IDeaS) is vast, as Demand360 has "demand and rate insights from 44k hotels" and enables Operator Defendants to view "12 months of forward-looking rate and demand data."[61]

148.    Demand360 provides users with non-public data about self-selected competitors. Demand360 allows users to select data sets of four or more competitor hotels located in the same geographic market, which Demand360 refers to as a "competitive set."[62] Demand360 provides twelve months of aggregated, forward-looking demand and price data for the competitive set.

149.    While superficially anonymous, the aggregation can be easily reversed. For example, because Demand360 allows users to create overlapping competitive sets (e.g., competitive sets in which all but 1 hotel overlaps), Hotel Defendants can isolate (and, therefore, determine) a specific competitor's non-public occupancy and pricing data.

150.    Demand360 gives users and IDeaS an unparalleled view of competition, which would not be available but-for the provision and use of the non-public demand and pricing data by competitors. According to Amadeus, "[t]he best performing hotels have mastered the use of forward-looking demand data to make more informed decisions that maximize their revenues and help them earn their fair share of bookings."[63]  "Hoteliers that use this powerful information

---

[61] https://amadeus.com/en/newsroom/press-releases/ai-hospitality-demand360-meetingbroker; https://connect.amadeus-hospitality.com/hubfs/Amadeus%20Demand%20360_Five%20Ways%20Forward-Looking%20Demand%20Data%20Can%20Boost%20Revenue.pdf.

[62] "Five Ways Forward-Looking Demand Data Can Boost Your Hotel's Revenue." https://connect.amadeus-hospitality.com/hubfs/Amadeus%20Demand%20360_Five%20Ways%20Forward-Looking%20Demand%20Data%20Can%20Boost%20Revenue.pdf.

[63] https://www.amadeus-hospitality.com/resources/five-ways-forward-looking-demand-data-can-boost-your-hotels-revenue/.

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW

understand that educated guesswork has been replaced by real, hard data from actual future bookings in their market."[64] Likewise, one of the benefits of using Demand360 is to "see in advance when you are out parity with the market," i.e., see when your prices can be increased profitably.

151.    Similarly, Amadeus's Director of Business Intelligence Success Management Deni Popluharova explained in an online video with Operator Defendant Hyatt called "Best practices in Demand360+" that the Demand360 Occupancy Index indicates when a hotel is getting "more than fair share" and "less than fair share."[65] This metric is based on current and future occupancy data (i.e., non-public information). Moreover, competitors (like Operator Defendants) should want to maximize their share of the market and not, as Amadeus facilitates, coordinate "fair share" among competitors.

152.    Amadeus has explained that Demand360 data allows hotels to keep rates high when it knows its competitors are at high occupancy, explaining "[i]f you know the market will sell out because there is a big event in town or a holiday weekend and you are pacing behind your competitive set, the answer could be to hold your rate. Once your competitors sell out, you will be able to drive high ADR [average daily rate] business as the only available hotel."[66] This pricing strategy is only possible because Demand360 users have knowledge of competitor non-public demand and pricing data.

---

[64] "Five Ways Forward-Looking Demand Data Can Boost Your Hotel's Revenue." https://connect.amadeus-hospitality.com/hubfs/Amadeus%20Demand%20360_Five%20Ways%20Forward-Looking%20Demand%20Data%20Can%20Boost%20Revenue.pdf.
[65] See video at https://www.amadeus-hospitality.com/hyatt-business-intelligence/.
[66] "Five Ways Forward-Looking Demand Data Can Boost Your Hotel's Revenue." https://connect.amadeus-hospitality.com/hubfs/Amadeus%20Demand%20360_Five%20Ways%20Forward-Looking%20Demand%20Data%20Can%20Boost%20Revenue.pdf.

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW

### v. In Addition to Generating Pricing and Occupancy Decisions, IDeaS Shares Competitor Data Directly with Users.

153. IDeaS shares real-time data provided by users with competing hotel operators. For example, the following diagram shows an IDeaS G3 RMS dashboard in which IDeaS is providing one user with real-time information about a direct competitor's price changes. The user selected the "Notifications" tab and then the "Competitor Price Change" notification. The right side of the diagram shows that, when making these selections, IDeaS provides the user with transaction-level data about a competitor's price change, including the specific competitor that changed its prices (Clayton Property), the exact change in price ($70 change from $429 to $499), the room type for the price change (Standard Room), and the date of the consumers' stay (4/23/2020). By providing real-time or near-real-time visibility into horizontal competitors' pricing, IDeaS' RMS enables the Operator Defendants to ensure that their own pricing keeps pace with their co-conspirators' supra-competitive pricing and enforces discipline on any co-conspirators who attempt to gain market share by underpricing the other Operator Defendants. Plaintiff has not uncovered any facts that indicate the G3 RMS functions any differently or no longer provides this type of pricing information concerning competitors.



154.    IDeaS also provides users with a "Competitor Details" function, which allows users "to view the most recent data from all competitors" and that the "Price" component therein allows users to access the "pricing decision" that IDeaS generated for the competing hotels. The following is a screenshot of content from IDeaS website:

| Detail | Description |
|---|---|
| Price | The pricing decision for the competitor, if available. |
| | For properties in countries with Tax-inclusive Pricing❶, the competitor price includes the tax percentage that you set up. |
| | A "Closed" value in this column indicates that the competitor is closed, or the rate being shopped is restricted for a given arrival date and LOS. G3 RMS creates a value for that competitor and uses that in its calculations. The system sets the value assuming that closed competitors are a sign of compression and high demand in the market. |

155.    In addition to pricing decisions and price changes, IDeaS' RMS provides users with other data points, such as competitors' real-time occupancy rates and forecasts, overbooking

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW

protections, and unit characteristics. Like the pricing decisions and changes, much of this information incorporates competitively sensitive, non-public information collected from all its hotel operator participants.

156.    In addition, as discussed above, IDeaS facilitates the sharing of Demand360 data among competitors through its integration and partnership with Demand360. And the Demand360 data includes a significant amount of non-public, competitively sensitive data about competitors concerning occupancy and pricing that can be de-anonymized with ease.

### E.    Operator Defendants Have Agreed to Fix Hotel Room Rates by Outsourcing Pricing Decisions to IDeaS, which Shares Competitively Sensitive Information with Competitors.

157.    Through their common use of IDeaS' RMS and Demand360, Operator Defendants agreed and conspired to share non-public price and occupancy information with each other and to delegate pricing decisions to a common agent—IDeaS. This, in effect, deprives the hotel markets of independent centers of decision-making by competitors and allows Operator Defendants to profit from collusive overcharging for hotel rooms in the Relevant Market and Sub-markets.

158.    To receive the benefit of IDeaS' supra-competitive pricing, Operator Defendants must provide their commercially sensitive, real-time, non-public data on prices and occupancy. In exchange, IDeaS promises the Operator Defendants revenue increases that beat the market by as much as 36%. [67]  All Defendants participate in this unlawful conspiracy and profit from it. The losers are Plaintiffs and the Class Members who pay inflated prices for hotel rooms affected by the conspiracy.

---

[67] https://ideas.com/success-story/the-burrard/.

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW

159.    Operator Defendants have also agreed among themselves to artificially increase, stabilize, or otherwise set hotel room rates. Supporting this position, Operator Defendants (i) send non-public, competitively sensitive pricing and occupancy data to IDeaS and Demand360 knowing which of their competitors are doing the same and that such data will be used to calculate pricing and occupancy decisions for competitors; (ii) adopt pricing and occupancy decisions from IDeaS automatically in nearly every instance knowing the decisions include non-public competitor data and that their competitors are doing the same; (iii) implement price floors (referred to as "Last Room Value" by IDeaS) that prevent competition below a certain price knowing their competitors will do the same and, therefore, will not lose market share; and (iv) implemented complex and historically unprecedented parallel changes to pricing and occupancy strategies, resulting in higher prices and lower occupancy. Several other factors support the alleged horizontal agreements among Operator Defendants, including (i) the Operator Defendants all had a very strong motive to conspire given that each lost roughly 50% of their revenue in 2020 due to the Covid-19 pandemic; (ii) the Operator Defendants all engaged in actions against their interests but-for the existence of the conspiracy, including sending non-public, competitively sensitive data to IDeaS knowing it would be used to help competitors price and setting price floors well-above the marginal cost of renting an additional room even during periods of low demand; and (iii) the hotel market is particularly susceptible to the type of collusion alleged herein given the fungibility of hotel rooms (particularly at the rate code level), the relatively high concentration in the hotel market, and the high barriers to entry in this market given it costs hundreds of millions of dollars and takes several years to develop a new upscale hotel and obtain the necessary permits and licenses to operate.

160.    Given the above, IDeaS connects Operator Defendants in a unity of purpose and common design and understanding to fix hotel room prices. The effect of these actions is the same

as if the Operator Defendants and their co-conspirators had met in person to exchange their confidential information directly and use it to set supra-competitive prices. Supra-competitive pricing cannot be achieved without both the exchange of non-public pricing and occupancy information and the agreement of all Operator Defendants and their co-conspirators to adhere to the agreed-upon price. This is an agreement to restrain trade between horizontal competitors that courts have historically treated as *per se* illegal.

161.    Operator Defendants know which of their competitors are participating in the conspiracy. IDeaS disclosed current clients to hotel operators considering IDeaS RMS during the initial phase of the sale process because this information was a motivating factor for potential users. IDeaS also disclosed current clients if other clients asked for the information.

162.    IDeaS openly publicizes the identity of the hotel operators using its RMS, including by issuing press releases when executing agreements with hotel operators, [68] providing numerous testimonials on its website from hotel operator-users, [69] and listing users in marketing materials, such as the following graphic found in the G3 RMS brochure:

## Leading Hotels Trust IDeaS

    

    

163.    As shown above, due to Operator Defendants' adherence to the conspiracy and use of supra-competitive pricing decisions, their room rates have increased to record levels, but their

---

[68] https://ideas.com/news/hyatt-will-deploy-ideas-platform/
[69] https://ideas.com/client-success/

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW

occupancy rates remain at or below pre-Covid 19 levels. And Operator Defendants know that participating in the conspiracy and implementing IDeaS' pricing decisions lowers occupancy rates. As the following diagram demonstrates, IDeaS provides users with forecasted occupancy rates based on its recommended prices, meaning Operator Defendants have chosen to adopt a strategy of lower occupancy rates:



164.    Operator Defendants are strongly incentivized not to override IDeaS' pricing decisions. Operator Defendants spend millions of dollars per year to deploy IDeaS' RMS, the central feature of which is IDeaS' pricing decisions. Operator Defendants would not continue to spend millions of dollars annually if they were not using IDeaS' pricing decisions. IDeaS' RMS clients also retain IDeaS at a 98% rate and would not do so unless using the central function for which they paid—pricing decisions. [70]

---

[70] https://ideasservices.wpenginepowered.com/wp-content/uploads/2020/06/IDeaS-G3-RMS-Brochure-EE.pdf

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW

165.    Operator Defendants also know that cooperation is essential to the success of their conspiracy and their ability to impose anticompetitive overcharges. And Operator Defendants are reaping significant benefits from the conspiracy, as during the conspiracy they are generating record revenues via historically high room rates. The Operator Defendants are, therefore, strongly incentivized to continue to adhere to IDeaS' pricing decisions.

166.    Because IDeaS' RMS and algorithm function as a shared pricing agent for Operator Defendants, they do not need to communicate directly with the other co-conspirator hotel operators. Instead, IDeaS furnishes the information each needs to agree to and effectuate the conspiracy, including the identity of the participating competitors and the prices they are charging.

**F.    Operator Defendants' Parallel Pricing Demonstrates Agreement and Conspiracy.**

167.    Consistent with their participation in the conspiracy, the prices charged by the Operator Defendants have moved in parallel throughout the Class Period.

168.    For example, as demonstrated above, Operator Defendants have engaged in complex and historically unprecedented parallel changes to price and occupancy strategy during the conspiracy. Following the pandemic and during the Class Period, the Operator Defendants increased room rental rates to their highest all-time level, surpassing pre-pandemic levels with no equivalent increase in demand, as occupancy levels remained at or below pre-pandemic levels. These unprecedented, simultaneous parallel changes in prices by all Operator Defendants are consistent with a change in pricing strategy that reflects adoption and adherence to IDeaS' decisions for maximizing RevPAR and ADR, the intended result of the Operator Defendants' agreement and conspiracy to outsource pricing decisions to IDeaS.

169.    These uniform changes to pricing strategy resulting in a disconnect between price and demand are also consistent with IDeaS' goal of limiting price competition among co-

conspirators by instituting pricing floors. As explained in the article titled "What is Dynamic Pricing? What Hospitality Pros Should Know," IDeaS implements controls such as pricing floors to prevent price competition because this could "spark a 'race to the bottom' with competitors through prices that may hurt the perception of your property's value or risk overall profitability."[71] Stated differently, IDeaS has adopted controls that ensure users will not compete on price below a certain level, which both artificially increases price and decreases demand.

170.    In addition to the information provided above, the following chart highlights the imbalance between price and demand for the US hotel industry. As the chart demonstrates, the ADR for hotel rooms in the US has increased nearly 20% since before the pandemic and nearly 5% since 2022 even though occupancy is down almost 3% and 1% respectively. [72]



2023 Highlights: Predictions vs. Outcomes CONTINUED

U.S. Hotels Performance
Annual, Average

Source: Oxford Economics and STR     2019  2022  2023

G.    Operator Defendants Engaged in Parallel Pricing Due to the Conspiracy and Not Contemporaneous Independent Conduct.

[71] https://ideas.com/what-is-dynamic-pricing/.
[72] https://www.ahla.com/sites/default/files/SOTI.2024.Final_.Draft_.v4.pdf

171.    Operator Defendants' simultaneous usage of IDeaS' RMS and its pricing algorithm strongly infers that the parallel pricing patterns observed in hotel room rates is the result of a collusive conspiracy rather than the product of independent pricing decisions. "In some situations, the evidence may disclose cooperative conduct among the defendants—such that a 'combination' of competitors joining together their decision-making can be inferred from their cooperative actions"—in particular, where there is "an invitation proposing collective action followed by a course of conduct showing acceptance[.]" U.S. Dep't of Justice, Memorandum of Law in Support of the Statement of Interest of the United States, Nov. 15, 2023, In re: RealPage, Rental Software Antitrust Litigation (No. II), No. 3:23-MD-3071 (M.D. Tenn.), ECF No. 628 (urging denial of motions to dismiss Section 1 claims alleging a scheme by a group of owners of rental housing to outsource their pricing decisions to an RMS offered by RealPage, Inc.).

172.    IDeaS also admits that its controls restrict competition between Operator Defendants and co-conspirators through things like "pricing floors." As the following statement makes clear, but-for its controls, hotel operators would continue to compete through lower prices. However, due to its controls, hotel operators do not engage in this competition:

> **Unchecked discounting and value perception:** Without proper controls in place like pricing floors, demand-driven dynamic pricing could spark a "race to the bottom" with competitors through prices that may hurt the perception of your property's value or risk overall profitability.

173.    The Operator Defendants also attended other user meetings and summits run, sponsored, or promoted by IDeaS. According to IDeaS, these client summits are intended to provide the co-conspirator hotel operators with "insights and best practices on optimizing multi-unit revenue management performance; the power of analytics and how best prices are determined; [...] to showcase how IDeaS consolidates hotel data to deliver total profit

optimization." [73]  IDeaS bestows awards to its clients at these meetings for the purpose of "honoring individuals for their collaboration, partnership, bold thinking and mutual support of progress and innovation." [74]

174.    IDeaS would bring together C-level employees from all IDeaS' clients for conferences, including executives from Operator Defendants. According to FE1, "everyone attends conferences, so there is a broad awareness of all chains" that use IDeaS.

175.    According to IDeaS' website, its largest annual summit is called "Converge" and is "an exclusive conference for clients of IDeaS, **designed to foster insights and collaboration within our client community**."[75] The event brings together senior leaders from the hospitality industry to explore how technology can drive success. For its June 2024 conference in Miami, Florida, IDeaS proudly tells attendees that they will "Join 300+ Global Hospitality Executives to Discuss the Future of Revenue Management."[76]

176.    The Converge conference delivers networking opportunities, continuing revenue management education, and business growth strategies, all of which are set up by IDeaS and focused on maximizing revenue for users. This includes several discussions focused on using the G3 RMS to maximize revenue for users.

177.    For example, the 2024 Converge Hospitality Revenue Summit in Miami started with a "popular networking event" for "IDeaS clients" to "[e]njoy cocktails" and honor various IDeaS "client innovators and partners."[77] The presentations, which were bookended by

---

[73]https://www.hospitalitynet.org/news/4111666.html#:~:text=insights%20and%20best,total%20profit.
[74] https://ideas.com/client-award-recipients.
[75] https://events.sas.com/event/0fb5665a-3634-464e-b4f5-22def9c389f0/summary (emphasis added).
[76] https://ideas.com/2025-converge-hospitality-revenue-summit-london/.
[77] https://ideas.com/converge-summit-miami-2024/.

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW

"networking breaks," included the following topics: "Partner Perspectives: The State of the Industry;" "New Frontiers in Advanced Optimization," which promised that attendees would "[g]ain invaluable insights into how hotels can effectively optimize pricing to maximize revenue, enhance profitability, and navigate uncertain market conditions with confidence;" and "The Power of Precision Forecasting: Elevating Profitability One Percentage Point at a Time," which "explore[d] the state of hotel forecasting, why focusing on rooms revenue is not enough, and how hotels are improving total revenue forecasting practices."[78] The event concluded with a "closing reception."[79]

178.    IDeaS has created a "Business Justification Letter" for individuals to use to justify the cost and time of the conference to their respective organization. According to the letter:

> This event will bring together a global community of top hotel leaders, hospitality technologists, media publications and market analysts to explore the link between revenue optimization and asset valuation. IDeaS will also be sharing their latest innovation roadmap and product updates.

This event will help me expand my knowledge in these areas to help elevate my expertise and increase our total revenue and profit potential. As an intended outcome, I will be better equipped to present strategies and plans that will facilitate productive change to influence transformation within our organization.[80]

179.    Through the actions described herein, Operator Defendants have been and are acting against their economic self-interests but-for the conspiracy. Operator Defendants could not have profitably implemented the pricing decisions from IDeaS unless their co-conspirators were

---

[78] *Id.*
[79] *Id.*
[80]
https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fstorage.pardot.com%2F398202%2F1707503259mOoCbyku%2F2024_IDeaS_Summit_Business_Justification_Letter_Bangkok.docx&wdOrigin=BROWSELINK

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW

doing the same. As explained above, Operator Defendants are charging record-high prices without a corresponding increase in occupancy (demand) to justify the prices, leading to record profits. Acting independently, the Operator Defendants would not and could not profitably implement this strategy because competitors would undercut the supra-competitive prices and the Operator Defendants would lose revenue.

180.    Similarly, it would be against the Operator Defendants' self-interest to share confidential information with IDeaS but-for the conspiracy. Operator Defendants send IDeaS a significant amount of non-public, transaction level data on prices and occupancy. They do so knowing IDeaS shares this information with competitors through pricing decisions and demand forecasts incorporating the data. If they were not engaged in a conspiracy in which they were receiving pricing decisions and demand forecasts incorporating the same information from competitors, then Operator Defendants would be competitively disadvantaged by providing this data and would not do so.

181.    The Operator Defendants have strong incentives to collude. Hotel operators suffered unexpected and massive reductions in revenue during the Covid-19 pandemic, including Operator Defendants. In 2020 alone, hotel industry revenue dropped by nearly 50%. Based on publicly available data, Operator Defendants suffered similar or worse reductions in revenue. Operator Defendants, therefore, had a unique and strong motive to conspire during the Class Period.

182.    IDeaS also presents Operator Defendants with a strong motive to collude. IDeaS claims to increase revenue for hotel operators by 8-15% by engaging in the conspiracy alleged herein and provides numerous testimonials on its website in which hotel operators increase revenue by much higher percentages. Additionally, the more faithfully co-conspirators adopt IDeaS' pricing decisions, the more revenue and profit each will earn.

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW

183.    The dynamics of the hotel room rental industry further contribute to the conspiracy. Hotel operators face high barriers to entry and expansion. Any party seeking to enter the hotel market must have significant time and financial resources. It costs tens of millions or hundreds of millions of dollars to construct a hotel. And it takes several years to acquire the necessary approvals and permits from state and local governments to build a hotel. Hotel operators seeking to expand face similar barriers, as significant expansion also costs millions of dollars and often requires additional government approvals and permits.

184.    Upscale hotels situated in prime locations, such as those operated by Operator Defendants, tend to have a lower price elasticity because they cater to high-end customers who are willing to pay premium prices, particularly in the short term. Many consumers generally rent hotel rooms because they are traveling to a specific location for an event or attraction and are only willing to travel a limited distance from their hotel to the event or attraction. Consumers' choices are, therefore, limited to hotels in the general vicinity of the event or attraction. As a result, hotel markets are susceptible to, and cannot discipline against, cartel price fixing.

**H.    Federal Antitrust Authorities Have Identified the Harm Caused by this Form of Algorithmic Pricing.**

185.    Federal antitrust regulators have described in detail the concerns raised by the type of algorithmic pricing platform alleged here. The former Acting Chair of the Federal Trade Commission, Maureen Ohlhausen, described how using shared price-setting algorithms by competitors is precisely the type of agreement prohibited by antitrust law, including where the pricing decisions are outsourced to a third-party, and provided the following hypothetical:

> What if algorithms are not used in such a clearly illegal way, but instead effectively become a clearing house for confidential pricing information? Imagine a group of competitors sub-contracting their pricing decisions to a common, outside agent that provides algorithmic pricing services. Each firm communicates its pricing strategy to the vendor, and the vendor then programs its algorithm to reflect the firm's pricing strategy. But because the same outside vendor now has confidential price strategy information from multiple competitors, it can program its algorithm to

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW

maximize industry-wide pricing. In effect, the firms themselves don't directly share their pricing strategies, but that information still ends up in common hands, and that shared information is then used to maximize market-wide prices.

Again, this is fairly familiar territory for antitrust lawyers, and we even have an old fashioned term for it, the hub-and-spoke conspiracy. Just as the antitrust laws do not allow competitors to exchange competitively sensitive information directly in an effort to stabilize or control industry pricing, they also prohibit using an intermediary to facilitate the exchange of confidential business information.

Let's just change the terms of the hypothetical slightly to understand why. Everywhere the word "algorithm" appears, please just insert the words "a guy named Bob."

Is it ok for a guy named Bob to collect confidential price strategy information from all the participants in a market, and then tell everybody how they should price? If it isn't ok for a guy named Bob to do it, then it probably isn't ok for an algorithm to do it either.[81]

186.    IDeaS here is "Bob" in the hypothetical. IDeaS collects confidential information from each Operator Defendant and then uses that information to generate pricing decisions, which Operator Defendants consistently implement.

187.    Likewise, in the DOJ Memorandum of Interest in RealPage, the DOJ explained that Section 1 of the Sherman Act condemns collaborations that eliminate independent decision making in the market—regardless of how they are brought about. This includes prohibiting "competitors from fixing prices by knowingly sharing their competitive information with, and then relying on pricing decisions from, a common human pricing agent who competitors know analyzes information from multiple competitors. The same prohibition applies where, as here, the

---

[81] Maureen K. Ohlhausen, *Should We Fear The Things That Go Beep In the Night? Some Initial thoughts on the Intersection of Antitrust law and Algorithmic Pricing*, Federal Trade Commission (May 23, 2017), https://www.ftc.gov/system/files/documents/public_statements/1220893/ohlhausen_-_concurrences_5-23-17.pdf

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW

common pricing agent is a common software algorithm." [82]    Based on its analysis, the DOJ

concluded that this type of behavior was *per se* unlawful under Section 1 of the Sherman Act. The

Operator Defendants and IDeaS are engaging in precisely such conduct here.

## I.    Defendants' Conspiracy Harms Consumers and Competition

188.    Defendants' agreements, conspiracy, and collusive conduct substantially injures

competition in the Relevant Sub-markets. Instead of making independent decisions on prices and

occupancy rates, the Operator Defendants and their co-conspirators have outsourced these

decisions to IDeaS as a common decision-maker, thereby eliminating price competition in the

Relevant Sub-markets and enabling the Operator Defendants to charge supra-competitive prices.

As a result, Plaintiffs and Class Members have paid and are paying higher prices for hotel rooms

than they otherwise would pay had Defendants not engaged in their conspiracy.

189.    IDeaS repeatedly touts that use of its RMS and algorithm will lead to significantly

more revenue for hotel operators than they would generate under normal market conditions.

According to IDeaS, hotel operators using its RMS and pricing algorithm earn 15% higher

revenues on average compared to hotel operators that do not use a revenue management solution.

190.    IDeaS users also admit they have been able to charge significantly higher prices

enabled by their use of IDeaS' RMS. According to Stefano Fusaro, Assistant Hotel Manager at

the Grand Hotel Minerva, "we sold rates that I would have never published if I hadn't been

working with IDeaS. In August, for example, we had revenues +16% versus last year and 8%

over budget." [83]

---

[82] U.S. Dep't of Justice, Memorandum of Law in Support of the Statement of Interest of the United States, Nov. 15, 2023, *In re: RealPage, Rental Software Antitrust Litigation (No. II)*, No. 3:23-MD-3071 (M.D. Tenn.), ECF No. 628.
[83] https://ideas.com/wp-content/uploads/2020/06/IDeaS-G3-RMS-Brochure-EE.pdf.

191.     Furthermore, through its use of disaggregated, non-public data from multiple competitors, IDeaS can identify demand characteristics that allow it to suggest room prices that may seem to contradict common economic intuition. For example, one hotel operator explained how IDeaS' RMS in one instance allowed them to sell smaller hotel rooms at higher rates than larger rooms with more amenities because IDeaS detected a surge in demand for the smaller rooms.

192.     IDeaS also admits to using pricing controls like LRV that prevent competitors from competing on price below certain values.

193.     The harm to competition and injury to consumers alleged herein will worsen over time. IDeaS' algorithm is constantly learning, thereby becoming more adept at setting supra-competitive prices as it receives additional data. Therefore, as long as users continue to provide IDeaS with non-public, transaction-level data, the algorithm's recommended prices will become increasingly effective at overcharging hotel guests.

194. In sum, Defendants' anticompetitive conduct has at least the following effects: (i) restraining and reducing competition among Operator Defendants and their co-conspirators nationwide and in the Relevant Sub-markets; (ii) fixing, maintaining, and/or stabilizing artificially high prices for hotel rooms; (iii) fixing, maintaining, and/or stabilizing the supply of hotel rooms available at various price points; and (iv) depriving the markets of independent centers of decision-making. This anticompetitive conduct has caused Plaintiffs and Class members to pay artificially high prices for hotel rooms.

### J.     Market Definition

195.     Defendants' actions described herein constitute an unlawful conspiracy to fix, raise, stabilize, or maintain artificially high rental prices for hotel guest rental rooms across the

United States. Such actions have typically been treated as *per se* illegal under Section 1 of the Sherman Act or, in the very least, given "quick look" treatment by the courts.

196.    To the extent the Court analyzes the claim under the rule of reason, the relevant product market is the market for upscale hotel room rentals by the public.

197.    The relevant geographic markets are: the Atlanta–Sandy Springs–Roswell, GA MSA; the Baltimore–Columbia–Towson, MD MSA; the Boston-Cambridge-Newton, MA-NH MSA; the Chicago-Naperville-Elgin, IL-IN-WI MSA; the Dallas-Fort Worth-Arlington, TX MSA; the Houston-Pasadena-The Woodlands, TX MSA; the Las Vegas-Henderson-North Las Vegas, NV MSA; the Los Angeles-Long Beach-Anaheim, CA MSA; the Miami-Fort Lauderdale-West Palm Beach, FL MSA; the New Orleans-Metairie, LA MSA; the New York-Newark-Jersey City, NY-NJ MSA; the Orlando-Kissimmee-Sanford, FL MSA; the Phoenix-Mesa-Chandler, AZ MSA; the San Diego–Chula Vista–Carlsbad, CA MSA; the San Francisco–Oakland–Fremont, CA MSA; the Seattle-Tacoma-Bellevue, WA MSA; and the Washington-Arlington-Alexandria, DC-VA-MD-WV MSA.

198.    Operator Defendants and their co-conspirators collectively have market power in each of the Relevant Sub-markets. Operator Defendants Hilton, Wyndham, Hyatt, Four Seasons, and Omni, as well as co-conspirators like Accor, are several of the largest hotel operators in the U.S., which is significant given that the U.S. hotel market is concentrated.  IDeaS also provides pricing decisions to tens of thousands of other properties in the U.S., generating tens of millions of booking decisions daily.

199.    MSAs are core-based statistical areas associated with at least one urban area that has a population of at least 50,000. The MSA comprises the central county or counties or equivalent entities containing the core, plus adjacent outlying counties having a high degree of social and economic integration with the central county, or counties as measured through

1  commuting.

2      200.    The Relevant Sub-markets include all reasonable substitutes. Consumers do not

3  consider hotel rooms outside of a Relevant Sub-market to be a substitute for hotel rooms inside a

4  Relevant Sub-market. Industry experts recognize that hotels are differentiated products based on

5  location. Each Relevant Sub-market is a major US metropolis offering unique attractions.

6  Consumers stay in hotels in these cities and pay the available rates because they want to stay in

7  that specific location. Stated differently, consumers who are indifferent to location do not stay in

8  hotels in the Relevant Sub-markets and opt instead for lower cost options in smaller cities. A

9  consumer faced with a small but significant non-transitory increase in price (a "SSNIP") in a

10  Relevant Sub-market would not switch to a hotel located outside of that market. A family visiting

11  Chicago, for example, would not switch to a hotel in Champaign, Illinois in response to a SSNIP.

12      201.    Consumers also do not consider other short-term rental options as substitutes for

13  hotel rooms. Hotels offer a unique bundle of location, amenities, and services not available from

14  platforms such as Airbnb or Vrbo that offer short-term residential rentals. Because hotels offer a

15  different product than other short-term rental options, industry participants do not consider hotels

16  to be the direct competitors of other short-term rental options. Notably, in spite of price increases

17  in the Relevant Sub-markets over the past couple of years that were far greater than the five

18  percent magnitude assumed in the standard SSNIP exercise, consumers did not switch to other

19  short-term rental options in numbers large enough to make these price increases unprofitable.

20  Thus, consumers would not switch to other short-term rental options if faced with a SSNIP in

21  hotel room rates in the Relevant Sub-markets.

22      202.    While Plaintiffs have identified the foregoing Relevant Sub-markets, they

23  anticipate that discovery and expert analysis will lead to the addition of additional markets

24  because Operator Defendants operate nationwide.

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW

1

## VI.    CLAIM

### COUNT I

### <u>Violation of the Section 1 of the Sherman Act</u>
**(On Behalf of Classes for Injunction and Equitable Relief and Compensatory Damages)**

203.    Plaintiffs incorporate and reallege every allegation set forth in the preceding paragraphs of this Complaint as though fully set forth herein.  They seek equitable and injunctive relief on behalf of the National Class and trebled damages on behalf of the Rental Class.

204.    Beginning at a time unknown to Plaintiffs but at least since April 26, 2020, Defendants engaged in an ongoing agreement, contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act.

205.    IDeaS created and operated an RMS and algorithm that generates pricing decisions and demand forecasts for hotel operators. Defendant IDeaS agreed with Operator Defendants to generate pricing decisions and demand forecasts using non-public, competitively sensitive, real-time price and output data provided by the Operator Defendants co-conspirator hotel operators. Operator Defendants agreed among themselves and with their co-conspirators to (i) provide Defendant IDeaS with competitively sensitive, non-public, real-time data concerning pricing and occupancy for every transaction knowing that this information would, among other things, be analyzed with their competitors' data to generate supra-competitive pricing decisions and demand forecasts for each Operator Defendant and co-conspirator; and (ii) implement the pricing decisions generated by IDeaS. The agreements among Defendants alleged herein have consisted of a continuing agreement among them to engage in the anticompetitive conduct alleged herein.

206.    Defendants' combination or conspiracy has harmed competition nationally and in the Relevant Sub-markets and has caused anticompetitive effects that include supra-competitive prices and lower rates of occupancy. As a direct and proximate result of Defendants' unlawful combination or conspiracy, Plaintiffs and Class Members have been injured and will continue to

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW

be injured by paying more for hotel rooms than they would otherwise pay in a fully competitive market not harmed by the anticompetitive effects of Defendants' conspiracy. The economic harm suffered by Plaintiffs and the Class Members constitutes antitrust injury.

207.    Plaintiffs and Class Members are entitled to treble damages, attorneys' fees and costs, and injunctive relief enjoining Defendants from engaging in the violations alleged herein.

208.    Defendants' conduct, as alleged, violates § 1 of the Sherman Act, 15 U.S.C. § 1.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, for themselves and on behalf of the Classes of all others similarly situated, respectfully requests judgment against Defendants and the following relief:

A.    An Order determining that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives, and appoint counsel of record as Class Counsel;

B.    A finding that Defendants violated Section 1 of the Sherman Act by engaging in the contract, combination and conspiracy alleged herein;

C.    An award of damages to Plaintiffs and Class Members, including statutory treble damages, compensatory damages, punitive damages, and pre- and post-judgment interest to the extent permitted by law;

D.    An Order temporarily enjoining Defendant IDeaS from collecting competitively sensitive information from market participants and disseminating that information to competitors, either directly or through pricing decisions incorporating such information;

E.    An Order temporarily enjoining Operator Defendants from delegating or outsourcing their pricing decisions to IDeaS;

F.    An Order permanently enjoining Defendant IDeaS from collecting competitively sensitive information from market participants and disseminating that information to competitors, either directly or through pricing decisions incorporating such information;

G.  An Order permanently enjoining Operator Defendants from delegating or outsourcing their pricing decisions to IDeaS;

H.  An Order awarding Plaintiffs attorney's fees, expenses, and taxable costs to the extent permitted by law; and

I.  Such other further relief as the Court deems just and proper to protect the private and medical information of Plaintiff and the Class Members.

## VIII.  JURY DEMAND

Plaintiffs demand trial by jury of all issues so triable as of right.

DATED: August 25, 2025

**MOGIN LAW LLP**

_____/s/ Daniel Mogin_____

Daniel J. Mogin (SBN 95624)
Timothy Z. LaComb (SBN 314244)
4225 Executive Square, Suite 600
La Jolla, CA 92037
Telephone:    (619) 687-6611
Facsimile:    (619) 687-6610
dmogin@moginlawllp.com
tlacomb@moginlawllp.com

**JOSEPH SAVERI LAW FIRM, LLP**

Joseph R. Saveri (SBN 130064)
Cadio Zirpoli (SBN    179108)
Christopher K. L. Young (SBN 318371)
Kevin E. Rayhill (SBN 267496)
601 California Street, Suite 1000
San Francisco, CA 94108
Telephone: (415) 500-6800
jsaveri@saverilawfirm.com
czirpoli@saverilawfirm.com
cyoung@saverilawfirm.com
krayhill@saverilawfirm.com

**HARTLEY LLP**

Jason S. Hartley (SBN 192514)
Jason M. Lindner (SBN 211451)
101 West Broadway, Suite 820
San Diego, California 92101

Telephone: (619) 400-5822
hartley@hartleyllp.com
lindner@hartleyllp.com

**KOZYAK TROPIN &
THROCKMORTON LLP**
Benjamin J. Widlanski, Esq.
(Fla. Bar No. 1010644)
Robert J. Neary, Esq.
(Fla. Bar No. 81712)
2525 Ponce de Leon Blvd., 9th Floor
Miami, Florida 33134
Tel.: 305-372-1800
Fax: 305-372-3508
bwidlanski@kttlaw.com
rn@kttlaw.com
*Pro Hac Vice Application Forthcoming*

**PAUL LLP**
Richard M. Paul III, MO#44233
Ashlea Schwarz, MO#60102
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Tel: 816-984-8100
rick@paulllp.com
ashlea@paulllp.com
*Pro Hac Vice Application Forthcoming*


**DON BIVENS PLLC**
Don Bivens
15169 N. Scottsdale Road, Suite 205
Scottsdale, AZ 85254
Telephone:     (602) 708-1450
don@donbivens.com
*Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiffs*

FIRST AMENDED CONSOLIDATED COMPLAINT; CASE NO. 4:24-CV-02537-JSW